91   241
110  646

# SPURLOCK *v.* BROWN.

## (*Nashville.* February 27, 1892.)

1. WRITTEN INSTRUMENTS. *Knowledge of contents by maker. Presumption. Estoppel.*

The presumption obtains that the maker of a written instrument, who had capacity and opportunity to examine and understand it before signing, was acquainted with its contents. This presumption becomes conclusive, and estops the maker to show the contrary, where he stated at time of signing that he had read the instrument, and this admission was acted upon by others in matters affecting their rights. (*Post, pp. 247, 248.*)

Cases cited and approved: Miller *v.* Denmon, 8 Yer., 237; Rice *v.* Bank, 7 Hum., 41; Gardner *v.* Stanfield, 12 Heis., 150; Frazier *v.* Bassett, 1 Overton, 299.

2. WITNESS. *Corroboration of by his confirmatory statements not allowed, when.*

A witness, the maker of a written instrument, testified that he did not read the paper, and was not acquainted with its contents before signing it. He admitted that he stated to the other party and the subscribing witnesses at date of signing that he had read the paper, and this admission was proved by other witnesses. In corroboration of witness' testimony that he had not read the instrument before signing, his confirmatory statements, made recently after the signing, but not part of the *res gestæ*, were offered in evidence.

*Held:* These confirmatory statements are incompetent. (*Post, pp. 248–251.*)

Cases cited and distinguished: Hayes *v.* Cheatham, 6 Lea, 10; Glass *v.* Bennett, 89 Tenn., 479.

3. ANTENUPTIAL MARRIAGE-CONTRACT. *Marriage alone sufficient consideration for.*

An antenuptial marriage-contract, obtained and entered into fairly and understandingly, whereby the wife, upon consideration of the marriage alone, agrees to relinquish all claim to the husband's property,

16—7 P

Spurlock *v.* Brown.

constitutes an absolute and effectual bar to her suit seeking to assert
her rights as widow in her husband's estate. Marriage alone is a
sufficient consideration for such relinquishment. In such case it is
immaterial that the husband had a large estate, and that no dis-
closure of this fact was made to the wife, and that no adequate pro-
vision was made for her. (*Post, pp. 254–258.*)

Cases cited and approved: 25 Md., 538; 86 Ky., 114; 116 Ind., 545;
53 Vt., 54; 33 Kan., 460; 69 Me., 247; 95 N. C., 476.

4. SAME.    *Construction of.*

But such contract is based upon a pecuniary consideration, and not upon
that of marriage alone, where, having been made after the parties
became engaged, the husband, "in consideration of the consummation
of said marriage," conveyed certain property to the wife, and the
wife, "in consideration of the said conveyance," relinquished all
interest in the husband's estate. And, in such case, the relations of
the parties are confidential, and the wife will be relieved of her con-
tract if she has acted in ignorance of her pecuniary rights superin-
duced by the husband, although there may have been no intentional
fraud. (*Post, pp. 258, 259.*)

5. SAME.    *Case in judgment.*

S. and M., having engaged to marry each other, entered into an ante-
nuptial marriage-contract, whereby S. gave M. a life-estate in a
house and lot worth about $6,000, and M., in consideration thereof,
relinquished all interest in S.'s estate. M. was forty years and S.
sixty-three years of age. This contract was prepared by S.'s attor-
ney, who undertook to explain it to M., who had no other adviser.
S. had then and at his death an estate of about $100,000. M. had
about $3,700 personal estate, which passed to S. by virtue of the
marriage. No issue was expected and none came of this marriage.
There was no actual fraud on the part of S. or his attorney, but M.
was not informed that her $3,700 became the property of S. by virtue
of the marriage, and was induced to believe by S.'s despondent views
of his affairs that he had but a small estate.

*Held:* M. is not bound by this contract. It is without adequate con-
sideration, and entered into under mistake of both law and fact.
(*Post, pp. 243–246, 258–260.*)

Cases cited and approved: Drew *v.* Clark, Cooke, 374; Warren *v.* Will-
iamson, 8 Bax., 431; Trigg *v.* Read, 5 Hum., 533; Dalton *v.* Wolfe,
11 Heis., 502; Sparks *v.* White, 7 Hum., 87; 9 Hum., 82; 98 U.
S., 91.

Spurlock *v.* Brown.

6. SAME. *Same.*

And this contract is not cured of its infirmity by the fact that S. subsequently gave M. his note for the $3,700 he obtained of her by the marriage. (*Post, p. 265.*)

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

VERTREES & VERTREES for Spurlock.

EAST & FOGG, MARKS & MARKS, and B. F. SOUTH for Brown.

DICKINSON, Sp. J. On January 4, 1884, complainant was married to S. B. Spurlock. On December 24, 1883, after the parties became engaged, a ·marriage-contract was executed by complainant, who was then Margaret Mallon, and Spurlock, by which he conveyed to her an estate for life in a house and lot, and she agreed as follows:

"And I, the said Margaret Mallon, contract and agree with the said S. B. Spurlock, in consideration of the above conveyance, upon the consummation of said marriage, to accept the above as my portion of his property, either real, personal, or mixed, moneys, choses in action, or accounts, and I do hereby relinquish all my rights of dower or home-

stead in any real estate said Spurlock now has, or may have; and in case said Spurlock should die before I do, I hereby relinquish all and every interest in his estate I may or would be entitled to in consequence of said marriage."

Complainant had been in business, and had accumulated about $3,700, which, at the time this contract was made, and at the time of her marriage, was loaned to Spurlock. Nothing was said by the contracting parties in regard to this money, nor of the effect of the marriage upon it. On March 13, 1890, about a year before his death, he executed and gave to her his note for this money, with some interest, aggregating $3,735.50, conditioned that it should not bear interest during his life. Spurlock died January 23, 1891, leaving no descendants. Respondents are his next of kin. His estate at his death was worth, net, about $100,000. If there were no marriage-contract, complainant, as sole distributee, and for dower, would succeed to an estate worth about $50,000.

She filed her bill setting up these rights. In it she discloses the marriage-contract and attacks its validity as a bar to her claims. The answer specifically denies every material allegation of the bill, and controverts every proposition of law relied on by complainant. It avers that she executed the contract freely, understandingly, and for a sufficient consideration. It relies upon the contract as an equitable bar to complainant's legal rights in Spurlock's estate.

Spurlock *v*. Brown.

At the time of the marriage complainant was about forty years of age. She was a divorced woman, and her husband was then living. She had two children by this husband, but both had died. Her life had been a severe struggle. She married in Ireland at sixteen, and soon thereafter, being deserted by her husband, went by a sailing vessel to Australia, where she supported herself for six years as a domestic servant. She returned to Ireland, and then, a reconciliation having taken place, joined her husband in Nashville. She procured a divorce from him on the ground of his cruelty. She entered in the grocery business, catering to those in the lowly walks of life. She was industrious, thrifty, smart, and economical, and in addition to supporting herself, she gradually accumulated from the business which she conducted. The record shows that she was a quiet, unobtrusive woman, and that her reputation was good.

Spurlock, at the time of the marriage, was about sixty-three. Early misfortune had permanently impaired his health and caused him to withdraw from social life. He was a wholesale grocery merchant, and Mrs. Mallon was his customer. He knew her for years before her marriage, was familiar with her surroundings, and was her business adviser. It is in proof that he did not expect any children from the union. At the time the contract was made he was largely in debt, but his estate then was worth, net, fully as

much as it was at his death. There is an effort to show that complainant contrived the marriage, but the proof does not sustain it. His letters, written to her two years before the marriage, plainly manifest a deep and tender interest in her, and he was a regular visitor for some months before the marriage. Her origin and antecedents were humble, but she, so far as this record shows, had achieved a competency for herself by her own efforts, and had maintained a reputable character. His antecedents and family position were good, but, constrained by a misfortune, he had banished himself from the social orbit in which he might have moved. His life was lonely, his health impaired, and he was approaching inevitable decrepitude. Leaving out all consideration of pecuniary benefits, there certainly was no advantage in his status over hers—nothing to make marriage a condescension on his part. Their marriage appears to have been happy, and the proof shows that she was a thrifty and attentive wife, who nursed him tenderly in his long and painful sickness.

Complainant avers that she was induced to sign the instrument by Spurlock, who represented to her that it was meant only to save her the annoyance of going to the court-house to acknowledge deeds to his property, and that it did not cut her off nor affect her rights as wife. This direct charge of unmitigated fraud is in strange contrast with her repeated assertions in her testimony that Spurlock was a most honorable man, who never did lie nor wrong any one.

The contract was written, at the request of Spurlock, by G. J. Stubblefield, who then was a lawyer at Nashville. He testifies that he went, at Spurlock's instance, to read and explain it to Mrs. Mallon, and that he did so and left it with her after Spurlock had introduced him and retired. She denies that there was any such interview. The law would presume that she knew the contents of the paper she executed, it appearing that she was not illiterate. She admits that, on the day the contract was signed, it was in her possession about twenty-five minutes while Spurlock went to get G. J. Stubblefield and Hiram Stubblefield to witness it, and that she told them when they came that she had read the paper and would sign it. The paper is so plain and simple that any person of ordinary intelligence could understand that it cut off all her rights as wife in Spurlock's property. Complainant was a person of more than ordinary intelligence, and for years had successfully engaged in business. These two subscribing witnesses testify that she said before she executed it that she had read it and understood it. She admits that she told them that she had read it. She now says that she did not in fact read it, and that she did not know its contents.

An admission, though not conclusive against the party making it (12 Heis., 150; 7 Hum., 41), is, when made freely and without any qualification, the highest evidence. *Miller* v. *Denman*, 8 Yer., 237. To overcome it, the proof must be full and

unquestionable. *Rice* v. *Bank*, 7 Hum., 41. Like other parol evidence, it is subject to be weighed with other proof, and may be controlled; but it is obligatory if others, in conforming their actions to it, acquire rights with the knowledge of the person making it. 1 Overton, 299. This rule becomes more binding when the admission is solemn, and is made the foundation for the execution of a written contract.

To corroborate complainant, two witnesses testify that she told them, on the day the contract was made, that she had signed a paper for Spurlock without reading it.

In *Hayes* v. *Cheatham*, 6 Lea, 10, the Court says: "The rule is that where it is attempted to be established that the statement of a witness on oath is a recent fabrication, or where it is sought to destroy the credit of a witness by proof of contradictory representations, evidence of his having given the same account of the matter at a time when no motive existed to misrepresent the facts ought to be received, because it naturally tends to inspire confidence in the sworn statement." This rule was approved in *Glass* v. *Bennett*, 5 Pickle, 479. It is sometimes a matter of nice judgment to determine that no motive, at a given time, existed to misrepresent the facts. It could not be assumed in this case that no such motive existed at the time these declarations were made, for if the testimony of G. J. Stubblefield that he had read and explained the contract to her be

true, then these statements could have been made with no motive except to misrepresent facts and lay the foundation for just such a contest as this. But this testimony does not come within the rule, and for a more conclusive reason. No effort was made to discredit her testimony as to what occurred when the contract was executed, and no corroboration on this point was needed. The attempt is on her part to show that she made conflicting statements, and to have those made after the transaction, and not as a part of the *res gestæ*, override a solemn admission made by her before subscribing witnesses. There was no *duress* nor compulsion when she made this admission. To allow it to be overridden by subsequent conflicting statements, would be to subvert the foundation upon which all solemn contracts rest. There is no rule under which such evidence would be competent. A number of witnesses testify to conversations had with her during her marriage, and before any question of contest was mooted, which disclose that she knew of the marriage-contract and understood its effect upon her marital rights in his estate. These witnesses are interested and prejudiced, but so is she. The weight of testimony is strongly against her, but, independent of it and of the evidence of Stubblefield that he read and explained the contract to her, we hold that her own testimony and that of the witnesses introduced to corroborate her, though unexcepted to, is insufficient to overcome her solemn acknowl-

edgment, freely made, that she had read the pa-
per and understood it.

To sustain complainant's declaration that she
did not know and was misled as to the contents
of the contract, and for the further purpose of
showing that it is not binding because not within
the contemplation of either contracting party, it is
contended that Spurlock himself was ignorant of
its real effect. It is argued that Stubblefield proves
that the contract, as prepared by him, goes beyond
the written memorandum given him by Spurlock
as a basis of the instrument, and that this memo-
randum did not cut off her marital rights; and
further, that this fact, taken in connection with
statements made by Spurlock to purchasers of
realty from him, fully demonstrates that he did
not understand that the agreement cut her off
from his estate, thus confirming her testimony that
he induced her to sign it by stating that it was
a mere paper to save her from trouble and annoy-
ance, and that it did not affect her rights as wife.

It is true that Stubblefield states that the mem-
orandum furnished by Spurlock only contained, so
far as he could remember, a description of the
bounds of the lot, a provision for a life estate in
her, and a disposition of the remainder. He states
further that he might not remember every thing.
He says that Spurlock came to him to write a
marriage-contract, and that he came back in some
days, when witness read to him the contract he
had prepared, it being the same one subsequently

executed; and that Spurlock said it was as they had agreed; that he then asked Spurlock what she would live on, and he replied that she was no pauper, and that she had between three and four thousand dollars in his hands, besides the house he was going to give her. This witness is disinterested and uncontradicted on this point, and his credibility is not assailed except as to memory, and that not successfully.

The proof shows that Spurlock was a successful business man, who had dealt frequently in real estate. It is most improbable that a man of this character would have taken the precaution of having two witnesses go to her home to attest her signature to an instrument which was wholly for her benefit; and it is still more improbable that he did not know the contents of a paper executed by him on such an occasion and with such solemnity.

One Williams testified that he bought a lot from Spurlock in 1889, and that, in response to his inquiry as to the necessity for Mrs. Spurlock to sign the deed, Spurlock said: "No; that he had a marriage-contract with his wife, which he made *so as to save her* from having to sign deeds." This is but a report of a conversation, which is weak testimony at best. If he had said that Spurlock stated he had a marriage-contract with his wife, and that it was so made that she did not have to sign deeds, the testimony would not be significant. He not only undertakes to state the effect,

which was all that was important so far as his affair was concerned, but to reproduce language so nicely framed as to express a purpose for which the marriage-contract was made. Such testimony should be received with great caution. This witness reports Spurlock, in the same conversation, as making statements in regard to his provision for his wife which the record shows to be absolutely untrue. Besides, he was a reticent man about his private affairs, and it is most improbable that he would have been so free, on such an occasion, with his confidence. This witness is contradicted by Holman, to whom he claimed to have repeated Spurlock's statement.

Another real estate purchaser testifies that Spurlock said: "I have signed a paper of about $35,000 to her; that she would not have to go all over the State and county signing of his deeds for such land as he might sell." This testimony is discredited by the statement that the paper gave her $35,000, which Spurlock could not have made without telling a conscious falsehood, and the absurdity of saying she would otherwise have to go all over the State to sign deeds. Independent of these ear-marks of invention, the language as reported does not conclusively declare the purpose for which the contract was made, but rather expresses the effect.

This is all the evidence, besides her own testimony, going to show that Spurlock did not know the scope of the contract. It weighs for nothing

against the testimony of Stubblefield and the actual execution of the instrument. Besides, Hoke, who was his confidential clerk, testifies that Spurlock, on the day before his marriage, told him that he had entered into a marriage-contract that would secure his property to his relatives. Cooley, a disinterested witness, says he told him after his marriage that he wanted his property to go to his sisters and their children. The fact of his giving her his note for the money he had borrowed of her, when he was very sick and after his arm had been amputated, is a strong circumstance to show that he knew she was cut off from his estate; for otherwise it would have been entirely unnecessary for her protection, inasmuch as she would have succeeded to all of his personalty if he died intestate. His knowledge that she would take nothing doubtless caused him to secure this money to her.

The evidence shows to our entire satisfaction that both Spurlock and his wife executed the paper knowing it was a marriage-contract, and that it cut off her marital rights in his property.

The proof clearly shows that all question of the money he had borrowed of her was, on making the contract, passed over *sub silentio.*

She surrendered all prospective marital rights in his estate, then worth, net, $100,000, and received a life estate in realty which had cost him, two months prior to the marriage, but $5,000, and on which he had spent in improvements about $1,000.

She insists that a marriage-contract, being cognizable only in a Court of Equity, will not be enforced unless the provision made for her be fair, reasonable, just, and equitable.

It is contended for defendants that marriage alone is a sufficient consideration to sustain any antenuptial agreement the parties may make respecting present or future rights in the property of each other.

The authorities are much in conflict. One class of cases view the interposition of the contract as merely an equitable bar, which is held conclusive provided it be entered into freely and understandingly. The other class treat the reliance on it as an invocation to the Court for its active interposition to enforce it specifically; and inasmuch as specific performance is not an absolute right, but is always within the discretion of the Court, they proceed to apply to the contract the usual tests to determine whether, under all the circumstances, the agreement is fair, just, and equitable, and especially whether the consideration be adequate. The methods of treating the contract would not produce such conflicting conclusions were it not for the high estimate put by one line of authorities upon marriage as a consideration and its entire pretermission by the opposing line, which seems to look only to the pecuniary features of the transaction.

In *Naill* v. *Maurer*, 25 Md., 538, and *Forwood* v. *Forwood*, 86 Ky., 114, marriage alone is held to be a sufficient consideration to sustain an ante-

nuptial settlement. In the latter case the Court says: "The consideration of marriage is not only regarded as sufficient to uphold an antenuptial contract, but the consideration may be regarded by the woman as of inestimable value to her—a value that would by far outweigh her property rights in the estate of her intended husband."

The same rule, though not necessarily involved in the decisions, and therefore not authoritatively adopted, is approved in the following cases: *McNutt* v. *McNutt*, 116 Ind., 545; *Mann* v. *Mann*, 53 Ver., 54; *Hafer* v. *Hafer*, 33 Kan., 460; *Wentworth* v. *Wentworth*, 69 Me., 247; *Brooks* v. *Austin*, 95 N. C., 476. The case of *Peet* v. *Peet*, 46 N. W. Rep., 1051, cited to sustain this view, is not in point, and by implication rests on the opposing doctrine.

The following authorities hold that the contract to be enforced must secure a provision for the wife not unreasonably disproportionate to the means of the intended husband: 2 Scrib. Dow., 424 (2d Ed.); *Gould* v. *Womack*, 2 Ala., 83; Woerner Am. Law Admn., 1, 264; Kline's Estate, 64 Penn. St., 122; Ruth Bierer's Appeal, 92 Penn. St., 265; *Pierce* v. *Pierce*, 71 N. Y., 154; *Tarbell* v. *Tarbell*, 10 Allen, 278; Shea's Appeal, 121 Penn. St., 302; *Stetter* v. *Folger*, 14 Ohio, 647; Smith's Appeal, 115 Penn. St., 319; Neeley's Appeal, 124 Penn. St., 406; Ludwig's Appeal, 101 Penn. St., 535.

The common law cherished nothing more than the right of dower. The wife was dowable in one-

third of the lands seized and possessed by the husband during coverture. And yet this right could be effectually barred by a jointure in lieu of dower made before marriage with her consent, without regard to the adequacy or inadequacy of the provision. In this State her right of dower only attaches to the land owned by her husband at his death. He may (excepting homestead) sell 'without her consent every foot of land and squander the proceeds, and defeat her dower absolutely. It is subject to every vicissitude of business venture, and is a most precarious expectancy. She may not survive him, and if she do, the period of her enjoyment may come when its value, measured by her prospect of life, may be reduced to a minimum. There is no standard by which a Court can, as of the time an antenuptial settlement is made, value such a future right. The same infirmities and uncertainties, though in an increased ratio, apply to her expectancy as distributee of personalty, the additional one of children to share being in most cases probable. If a Court shall take the value of his estate when the contract is made as a criterion, it will happen often that the provision assumed on this basis to be just will far exceed what she would have gotten after a life's shipwreck in the absence of a contract. On the other hand, the conditions may be reversed. The problem is to estimate what is a reasonable consideration for surrendering a future estate involved in so much doubt and hazard. The rule contended for

would be variable. in its results, according to the ideas of different judges as to what provision would be reasonable. It is plain that under this rule no such settlement would in any sense have any sanctity as a contract. It could have no fixed character until the judges, before whom it finally came, had decided whether it be reasonable. The fullest disclosures of property might be made, the advice of friends and lawyers be invoked, all solemnities of execution and acknowledgment be observed, and yet it would be a mere problem as to what would be reasonable projected into the future, to be decided perhaps by an unborn judge according to his peculiar notions, not confined by definite rules, and formed at a different period of time under the influence of changed conditions of society. This rule leaves out of view entirely marriage as a consideration.

Where a settlement made by the husband on the wife, without fraud on her part and in consideration of marriage, has been attacked by creditors, it has been uniformly sustained, and all the authorities concur in saying that marriage is the highest consideration for such a settlement. It is a sufficient consideration from the woman to enable her to take all of her intended husband's estate from his creditors. In our opinion there is no sound reason why she may not, if of age and acting freely and understandingly, agree, in consideration of the marriage alone, to give up the pecuniary benefits that would come from it. The

17—7 F

value of the marriage can be estimated by no one as well as herself; and if it be accepted by her freely, as an equivalent for monetary sacrifices, the Courts should not interfere after she has obtained the marriage she contracted for, no matter how great such sacrifices may be, provided she was not misled.

In this case the contract recites that a marriage is to be solemnized, and then proceeds as follows: "I, S. B. Spurlock, *in consideration of the consummation of said marriage*, do hereby and herein give," etc. When the portion binding her is reached, it says: "And I, the said Margaret Mallon, contract and agree with the said S. B. Spurlock, in consideration of the said conveyance," etc. Marriage is not made a consideration for her agreement. It need not be specifically mentioned as a consideration. *Naill* v. *Maurer*, 25 Md., 538. But here the terms of the instrument confine the consideration expressly to the conveyance made to her. Being so exactly limited in a contract drawn by his lawyer, it may well be held to have been entirely pecuniary. When this contract was made, the engagement to marry had been entered into. By the engagement she acquired a valuable right which, in case of a breach of contract, could have been enforced, and measured with reference to Spurlock's estate. She could have refused to sign the contract without impairing her right to have the marriage consummated or to enforce indemnity for a refusal.

Spurlock v. Brown.

Spurlock must have known that her marital rights, if not cut off, would in all probability be very valuable. Defendants prove that he took his own lawyer to her to explain the instrument. The relations of the parties had become confidential. He voluntarily assumed the office of having her instructed in respect of the agreement, and introduced Mr. Stubblefield to her for that purpose. Mr. Stubblefield testifies that he said nothing to her in regard to the effect of the marriage upon her rights to her own money, either in the absence of a contract or under the contract proposed. He says that, in his opinion, the money, if repaid to her before marriage, would have remained her separate estate. If he entertained this erroneous idea, it is not reasonable to suppose that she knew that she was surrendering her money. It does not appear that the question of her money was in any way considered, although her rights in it were to be affected by the marriage. Stubblefield shows that he did not contemplate it. It is evident from his testimony that he did not advise her as to the rights she had acquired by the engagement. She had a right to expect a fuller exposition of her legal status in respect of the purely money bargain she was making than she received.

It is manifest that she was not put in a position to deal intelligently with her rights. The result justifies this conclusion. Spurlock, by the marriage, acquired the absolute right to the $3,700

he owed her. She gave up all her rights in his estate. She got a life estate in a house and lot which, with improvements, had just cost him about $6,000. She was forty years of age. The life estate could not have exceeded, if it equaled, in value the amount of money she surrendered by the marriage. She practically, then, under the marriage and the contract, got nothing, and so surrendered for nothing, and not in consideration of the marriage, a legal right acquired by the engagement, which Spurlock was bound to know had great prospective value.

This is not a case simply of ignorance or mistake of law on her part. This, standing alone, cannot be relieved against. Other elements exist in the transaction. Those in whom she had confidence, upon whom she had a right to rely, procured from her (though certainly, so far as Stubblefield is concerned, not with wrong intent), for an expressed pecuniary consideration, a contract most detrimental to her; and, though voluntarily assuming to instruct her, they failed to advise her as to her legal rights and as to the real consideration she was getting under the combined effects of the contract and the marriage.

Mr. Pomeroy thus states the rule: "If the mistake of law is not pure and simple, but is induced or accompanied by other special facts giving rise to an independent equity on behalf of the mistaken person, such as *inequitable conduct of the other party,* there can be no doubt that a Court of Equity

will interpose its aid." Equity Jurisprudence, Sec. 842.

A mistake in law, produced by the representations of the other party, is as good a ground for relief in equity as a mistake in fact. *Drew* v. *Clark*, Cooke, 374. If a party, acting in ignorance of a plain principle of law, give up an indisputable right under the name of a compromise, equity will relieve from the effect of such mistake where, accompanying it, there is ignorance, weakness, or *misplaced confidence* upon the one side, or an unconscionable advantage is obtained. *Warren* v. *Williamson*, 8 Bax., 431; *Trigg* v. *Head*, 5 Hum., 533. A widow, ignorant of her legal rights, yielded to an administrator property which was exempt. This Court, through Chief Justice Nicholson, held that she acted in ignorance of her own rights under the law as widow, and that it was the administrator's duty to communicate to her what her rights were. *Dalton* v. *Wolfe*, 11 Heis., 502. A mere naked ignorance of the law will not be sufficient to authorize a Court of Chancery to set aside a contract, but *if that ignorance be superinduced by the other party*, or if there be *misplaced confidence*, or if advantage be taken of the weakness of intellect so as to obtain property at a greatly inadequate price, these and other influences mixed with ignorance of law will be sufficient. *Sparks* v. *White*, 7 Hum., 87.

In *Wheeler* v. *Smith* the Supreme Court of the United States set aside a release from an heir at

law to executors, made for an inadequate consideration under a mistake of law and some undue influence. The heir was influenced by the honest, though erroneous, opinion of one of the executors, who was a lawyer in whom he had confidence. He, however, had no interest in the result. The Court said: "The complainant, it seems, had studied law, but it is manifest from the facts before us that 'he was but little acquainted with business, was an inefficient and dependent man, easily misled, especially by those for whose abilities and characters he entertained a profound respect. * * But in making the compromise the parties did not stand on equal ground. * * * He did not act freely and with a proper understanding of his rights." 9 How., 82.

The Court reformed a contract made in mistake of law through a reliance upon the representation, honestly made by the company's agent, that the insurance in the form adopted would give the protection sought. The party relied upon the larger experience and greater knowledge of the agent. The Court says: "In deciding, therefore, as we do, that the complainants are entitled to have the policy reformed in accordance with the original agreement, it is not perceived that we enlarge or depart in any just sense from the general and salutary rule that a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts." *Snell* v. *Insurance Co.*, 98 U. S., 91.

Mr. Lawson thus states the doctrine: "But the common law rule, which refuses relief · against ignorance or mistake of law, and which is equally applicable in Courts of Law and Equity, is not enforced in equity where such ignorance or mistake is induced by fraud or imposition, or undue influence, or *an abuse of confidence*, springing out of the peculiar · relations existing between the parties." Rights and Remedies, Sec. 2341.

Complainant was not dealing at arm's length nor under the advice of her own counsel. Assuming to instruct, they should have done so fully, and she had a right to presume that such was the case. A failure to so advise, where such close confidence is reposed, whether purposely or through ignorance or misapprehension, is equivalent to positive misadvice.

There is another important fact which has great weight, and must be considered as one of the controlling elements in the transaction. She testifies that Spurlock told her that he was heavily in debt, and made the impression on her that he was not worth much. Other witnesses testify that he frequently spoke of being oppressed by his large indebtedness, and thus she is corroborated. Thus the impression produced by him was calculated to influence her to yield, as of little value and for an inadequate consideration what, upon full information, would have been apparently of great value. If the contract was freely entered into in consideration of marriage, the disproportion between the

estate and the settlement is no ground for presuming that proper information in regard to the value of the husband's estate was not possessed. In such a case there is no necessity for a disclosure. The case is different where the contract relates in terms to a money bargain, and it affirmatively appears that misleading impressions were made, and that the opposite party in interest, who undertook to advise her of her rights and upon whom she, from the confidential relations existing between them, relied, failed to give her such instructions as would fairly put her in a position to judge of the rights which she was yielding; and when these facts concur, and the contract made is greatly to her disadvantage, a Court of Equity will not give it effect. That she may have entered into the contract, even with a full understanding, is not the question. The Court cannot speculate about this. We hold that, under the facts stated, it was not fairly obtained, and therefore we cannot sustain it as an equitable bar to her rights. It can make no difference that Spurlock subsequently gave her his note for this money. This was, in law, nothing but a gratuity. The money became his absolutely by the marriage, no matter what he may have thought about it. It was in no way secured to her, and was liable for his debts. He had it entirely in his power to dispose of it in any way he might choose. He could not, by giving it to her subsequently, thus putting her in as good a position as if it had been reserved or voluntarily

yielded by the contract, destroy her rights in his estate which had not, by the agreement made under the facts as they existed, been impaired beyond equitable remedy.   No subsequent bounty, be it ever so munificent, could cure the infirmities of such a transaction, and convert it into a binding agreement.

The decree of the Chancellor is affirmed.

---

### DISSENTING OPINION.

LEA, J.   I cannot agree to the conclusion reached by a majority of the Court in this case.   The Court correctly, as I conceive, holds that the marriage-contract was executed by Mrs. Spurlock with a full knowledge of its terms; but because she was not informed of the legal effect of marriage upon some money she had loaned Spurlock before marriage, the marriage-contract is to be set aside, and not to be held binding on her.   If she understood, as I agree with the Court she did, the terms of the marriage-contract, that it was explained to her, knew the effects thereof, knew what she was to get from his estate in the event of marriage, and then signed and acknowledged it, she, after marriage, is bound thereby, although she may have been ignorant of the effect in law of marriage upon some money she had loaned Spurlock before marriage.   It does not affirmatively

appear that she did not know the law. Nothing was said by her about it, and no inquiry was made, and no explication given.

The result is, that although the marriage-contract was well understood by her, and fully explained, yet, because it does not affirmatively appear she knew the legal effect of marriage upon some property of hers, the contract must be held invalid and of no force and effect, and this though no inquiry was made and no thought given the subject by either party. The parties evidently had an understanding in regard to this money, for, after the marriage, she demanded and he gave his note for the amount, which she held at the time of his death. Such a ruling by this Court would virtually do away with all marriage-contracts, for if the wife had *any* property, however insignificant in amount, at the time of signing the contract and marriage, and after many years it could not be affirmatively shown that she knew the legal effect of marriage upon said property, the contract would not be binding, however well its effects and terms were known and understood by the parties. Such certainly never was the law, as I think, until this decision, from which I respectfully dissent.