Nashville & American Trust Co. *v.* Baxter *et al.*

(*Jackson*, April Term, 1937.)

Opinion filed May 22, 1937.

TRABUE, HUME & ARMISTEAD, of Nashville, for complainants.

MALONE & WADE, of Nashville, for John L. Craig and wife.

ALFRED T. ADAMS, of Nashville, for guardian *ad litem.*

ROBT. H. MARR, R. C. BOYCE, W. M. FUQUA, and W. D. DODSON, all of Nashville, for general legatees.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

The bill herein was filed on March 23, 1933, by the Nashville & American Trust Company, successor of the American Trust Company, executor and trustee under the will of Mrs. Sue Perkins Allen, for the purpose of having said will construed, and for directions in the administration of her estate.

The record before us presents the single issue as to whether five trust legacies shall abate on account of a deficiency of assets to pay all legacies in full. The chancellor answered this issue in the negative, and the Court of Appeals in the affirmative. *Certiorari* has been granted and the cause argued at the bar of this court.

The will was executed March 27, 1923. Three codicils bear dates of July 6, 1925, December 8, 1925, and April 13, 1926. Mrs. Allen died April 1, 1931. Her husband died before she executed her original will. She never had any children, but was survived by a brother, three sisters, twenty-one nieces and nephews, and twenty greatnieces and greatnephews, who were her closest kin. To each she gave a pecuniary legacy with the exception of one greatnephew living in a distant state, who was probably overlooked.

Mrs. Allen in her will directed the payment of fifty-nine pecuniary legacies to her relatives, friends, and certain charities, aggregating $222,500, and varying in amount from $100 to $20,000. At the time of her death her estate was valued at approximately a half million dollars, consisting of stocks, bonds, and real property.

Her principal asset was 4,667 shares of stock in the American National Bank, the market value of which, at the time of her death, was $75 per share, or $350,025. By March, 1933, the value of this stock had declined in value to $6 per share, and this fact accounts for the deficiency of assets to pay debts, taxes, and all legacies in full. Mrs. Allen, in her first codicil, directed that all inheritance and other taxes be paid out of her estate. After paying debts, taxes, and expenses of administration, the remaining assets, upon a valuation of $6 per share for American Bank stock, will be sufficient to pay general legatees about fifty cents on the dollar. In June, 1935, the executor was directed to sell this bank stock, and the price realized therefor will determine the amount which general legatees will receive. This stock is now quoted at $20 per share, and most likely had its sale been deferred a few years it would have sold for a sufficient sum to pay general legatees in full. It does not appear from the record that the legatees ever requested a sale of this stock, and no explanation appears as to why no portion of it was disposed of for more than four years after Mrs. Allen's death further than testimony that the stock was gradually declining and there was little demand fo it. The bank continued to pay semiannual dividends on this stock up to and including that of January 1, 1933. Under the will the fifty-nine legatees, with the exception of three, were made residuary legatees, and it is possible that these legatees did not wish the stock sold on a declining market.

The charitable bequests aggregate $38,000, and are as follows: Methodist Episcopal Church South, $10,000; McKendree Methodist Episcopal Church, Nashville, $10,000; Masonic Lodge, Nashville, as a memorial to her

husband, $10,000; Masonic Home, Nashville, $5,000; Tennessee Children's Home Society, $1000; Nashville Boy's Club, $1,000; and Protestant Orphan Asylum, $1,000.

Mrs. Allen by her will and codicils bequeathed to the American Trust Company, in trust, the sum of $50,500 for the use and benefit of the following relatives, to wit: Perkins Baxter, nephew, $20,000; Sloss Baxter, nephew, $2,500; Mrs. Katie Baxter Hutcheson, niece, $15,000; Sue Perkins Craig, greatniece, $3,000 and $10,000.

Sue Perkins Craig was born in August, 1920, and is the daughter of Mr. and Mrs. John Craig; the latter being a daughter of Mrs. Hutcheson. The record indicates that Mrs. Hutcheson was the favorite niece of testatrix, had lived with her since the death of her husband in 1913, and was dependent upon her for support. In her original will the trust for the benefit of Mrs. Hutcheson was only $10,000, but was increased to $15,000 by the second codicil. The trustee was to invest this legacy, collect and pay over the income therefrom semiannually to Mrs. Hutcheson during her life (beginning three months after testator's death), and upon her death to her children.

Perkins Baxter had made his home with Mrs. Allen for some time before her death. The trust for his benefit, and that of his brother, Sloss, in its terms was similar to that for Mrs. Hutcheson, with the exception of the three months provision. Upon their respective deaths the *corpus* was to go to certain designated persons.

The child, Sue Perkins Craig, was named for Mrs. Allen, and it is conceded that in the latter's affections she came first. Mrs. Allen built a home for Mr. and Mrs. John Craig adjoining her own, taking their note therefor with the understanding that it should be canceled at her death. It was also a part of the agreement that Sue

Perkins Craig should make her home with testatrix, which she did during the remainder of her life. The provisions which Mrs. Allen made for Sue Perkins Craig from time to time show that her affection for this child continually grew. In her original will testatrix bequeathed in trust for this child $2,500, the income from which, and so much of the principal as might be necessary, was to be expended for her education. By item 7 of her first codicil this was increased to $3,000. By item 1 of her first codicil she devised the five-acre tract of land on the Franklin Road, on which her dwelling was located, to Sue Perkins Craig. By item 5 of her second codicil she bequeathed all of her household and kitchen furniture and furnishings to this child. By item 6 of said second codicil she bequeathed to the American Trust Company, in trust, $10,000, the income from which, and so much of the *corpus* as might be necessary, to be used in the upkeep of said home place, paying taxes thereon, and for the support and maintenance of Sue Perkins Craig. The *corpus* of these trust funds were to be paid to Sue Perkins Craig when she attained her majority.

Item 22 of the original will is as follows:

"In the event my estate is not sufficient to pay all legacies and bequests in full, I direct that those to, or for the benefit of, Mrs. Katie B. Hutcheson, Nannie B. Overton, and Perkins Baxter, be paid in full, and all others be abated *pro rate.*"

The foregoing item was revoked and canceled by item 5 of the first codicil. No explanation of this change appears. It is suggested that it had occurred to testatrix that she should not show partiality among the three sisters, Nannie B. Overton, Mrs. Lucille B. Marr, and Mrs. Ewin B. Thomas, to each of whom a bequest of $6,000

was made. Oh it may be that at this time testatrix was thoroughly satisfied that her estate was sufficient to pay all legacies in full and a preference clause was unnecessary. Be that as it may, after revoking the preference item, testatrix in the same codicil added this provision:

"I will and direct that all incomes or annuities in and by my said will and this codicil directed to be paid to legatees or beneficiaries for life, or otherwise, shall begin to be paid within ninety days after the qualification of my executor; or as soon thereafter as practicable."

No such provision was made as to any other of the numerous legatees, and it was confined to those of her own household, with the exception of Sloss Baxter, whose bequest was small in comparison with the others. The term "or otherwise" probably refers to the educational fund to be expended on Sue Perkins Craig during her infancy.

The executor and trustee qualified on April 14, 1931. In compliance with the foregoing trust item in the first codicil, the executor, on May 26, 1931, set up the trusts by transferring to itself, as trustee, certain securities belonging to the estate, suitable for trust purposes, as follows:

1. Perkins Baxter securities of the market value of $19,997.77, and cash from the *corpus* in the sum of $2.23.

2. Mrs. Katie Baxter Hutcheson securities valued at $14,965.10, and cash in the sum of $34.90.

3. Sloss Baxter securities valued at $2,490.58, and cash in the sum of $9.42.

4. Sue Perkins Craig (education trust) securities valued at $2,950, and cash in the sum of $50.

5. Sue Perkins Craig (taxes, maintenance, and sup-

port trust) securities valued at $9,965.54, and cash in the sum of $34.46.

A separate account on the books of the trustee was opened with each *cestui que trust*. The trustee has paid to or for said beneficiaries the following sums: Perkins Baxter (as of February 23, 1935), $3,259.81; Sloss Baxter (as of same date), $403.36; Mrs. Katie Baxter Hutcheson (as of March 1, 1935), $2,345.02; Sue Perkins Craig (as of same date) on first trust, $447.55, and second trust, $53.15.

At the time these trusts were set up, and for some months thereafter, it is conceded that the value of the estate was more than sufficient to pay all debts and legacies. There is no suggestion that the executor acted otherwise than in good faith in setting up these trusts, or that the securities transferred to the trustee were undervalued. The executor was thoroughly familiar with all of the facts connected with the estate, and in setting up the trusts was attempting to carry out the express directions of testatrix. It is also disclosed by the record that the trust securities have depreciated in value, but to what extent does not appear.

Counsel for the general legatees, as distinguished from the trust legatees, in his brief concedes that an annuity cannot exist before a trust fund has been set aside as its basis, and that a trust cannot exist before the legacy has been delivered to the trustee. In other words, until the trust is set up the trustee cannot begin payment to the beneficiaries, which, in this instance, it was directed to do within ninety days after its qualification. The same counsel also makes this statement in his brief:

"It is undisputed that the functions of executor and of trustee are wholly separate and distinct, even though

502

the same person be both executor and trustee. The moment the trust legacy is turned over to the trustee control over this fund passes out of the hands of the executor and vests in the trustee.''

It is further conceded that when the funds have been delivered to the trustee the *cestui que trust* can have no contribution from the general or the residuary legatees, in case of a devastavit or a shrinkage in the value of the securities constituting the trust estate, and such is the law. *Lister v. Hardin,* 76 N. J. Eq., 360, 76 A., 558, 560, 139 Am. St. Rep., 767; *Grainger's Executors & Trustees v. Pennebaker,* 247 Ky., 324, 56 S. W. (2d), 1007, 1011; *Mills v. Smith,* 141 N. Y., 256, 36 N. E., 178; *Willmott v. Jenkins,* 1 Beav., 401; *Kendall v. Russell,* 3 Sim., 424. In the first-named case it is said:

''The mere fact that the trustee was Weeks, the executor, instead of some one else, can make no difference so far as the legal aspect of the case is concerned. If the trustee subsequently misappropriated the money, he is responsible, and not the other distributees of the estate.''

Under these authorities if the trust securities here involved had become worthless, or the funds had been lost through the failure of an apparently solvent bank, the beneficiaries could have no contribution from the other legatees. On behalf of the trust legatees it is insisted that the rule should work both ways, and that general legatees should have no recourse against them simply because it has developed that the securities from which they were to be paid their legacies have depreciated in value. We have been referred to no rule of law upon which such a recovery can be based. There is no statute authorizing such a recovery, and an action *in-*

*debitatus assumpsit,* for money had and received, will not lie because there was no mistake of fact. The executor was thoroughly familiar with all of the facts. If the executor paid over the funds to the trustee under a mistake of law, there can be no recovery. This court, in considering that question in *Employers Re-Insurance Corp.* v. *Going,* 161 Tenn., 79, 85, 86, 26 S. W. (2d), 126, 128, said:

"Counsel for appellant strongly urges equities which he insists the chancery court has power to recognize and enforce. He relies upon the recognition by the authorities that a case may arise in which there may be a recovery, even though the payment was made under a mistake of law. This was so stated in *Leach* v. *Cowan,* 125 Tenn., [182, at] page 206, 140 S. W., 1070, 1077, Ann. Cas., 1913C, 188, but the court therein emphasized that 'it must be under such circumstances as the court can see that it would be unconscionable for the party who obtained the advantage in such transaction or settlement to retain that advantage.' The court cites numerous cases which illustrate this principle. An examination of those cases demonstrates that mutual ignorance and mistake merely will not justify the application of the principle. Elements of wrongdoing, generally intentional on the part of the party receiving the benefit, must appear. For example, Mr. Pomeroy is quoted in *Spurlock* v. *Brown,* 91 Tenn. [241, at] page 260, 18 S. W., 868, 873, for this statement of the rule:

" ' "If the mistake of law is not pure and simple, but is induced or accompanied by other special facts, giving rise to an independent equity on behalf of the mistaken person, such as *inequitable conduct of the other party,*

there can be no doubt that a court of equity will interpose its aid.'' Pom. Eq. Jur., sec. 842.'

"A number of our cases are reviewed and it is made clear that, if the mistake is one of law, equity may relieve only where the mistake has been brought about by the representations of the other party, or where the ignorance has been superinduced by the other party, where some confidence has been taken advantage of, and like cases."

In 11 R. C. L. 250, it is said: "Not infrequently the right to a refunding of moneys already paid to distributees is predicated on a mistake on the part of executors or administrators in originally making such payment. Since, as a general rule, money paid by mistake of law, with knowledge of all the facts, cannot, in the absence of fraud, deceit, or undue importunity, be recovered back, so it is a rule that money paid by executors, under an erroneous belief that, as matter of law, the payee was entitled to it as the representative of a deceased legatee of the will, cannot be recovered back. Legatees cannot be compelled to refund to an executor where his mistake was merely as to the value of the assets and in consequence he voluntarily paid them their legacies."

In *Frost* v. *Atwood*, 73 Mich., 67, 41 N. W., 96, 98, 16 Am. St. Rep., 560, 565, the court, in holding that the power to compel contribution by devisees was wholly statutory, said:

"The statutes relating to this subject do not contemplate that property once turned over to the devisees and legatees shall continue to be specifically bound for any possible future deficiency. It may consist of personalty as well as realty, and of stocks or securities as well as specific chattels. It was held in *Eberstein* v. *Camp*, 37

Mich., 176, that the interest of the legatee vested at once, and should not be needlessly interfered with by the excutor. In the present case, the record does not show that if the executor had done his duty the debts would not have been fully paid within the proper statutory period, without any deficiency arising; and when he sees fit to allow all parties to rest on the idea that they can do what they will with their legacies and devises, the statute gives him no power to recall them."

In *Davis* v. *Newman*, 41 Va. (2 Rob.), 664, 40 Am. Dec., 764, the decision is succinctly stated in the syllabus as follows:

"Legatees can not be Compelled to Refund to an Executor where he, mistaking the value of the assets, voluntarily paid them their legacies, there being no creditors of the decedent, but his estate turning out inadequate for the payment of the legacies."

This question is very ably considered in *Scott* v. *Ford*, 45 Or., 531, 78 P., 742, 80 P., 899, 68 L. R. A., 469, the court holding that money paid by executors under the erroneous belief that, as matter of law, the payee was entitled to it as representative of a deceased legatee of the will, cannot be recovered back.

In *Fidelity Trust Co.* v. *Service Laundry Co.*, 160 Tenn., 57, 70, 71, 22 S. W. (2d), 6, 10, it is said:

"But when the testatrix names an executor as testamentary trustee, the fund bequeathed in trust may be treated as in the possession of the trustee, for the use of the beneficiary of the trust, as soon as the executors obtain possession of sufficient assets of the estate to justify the application to the trust of the sum fixed by the will. . . .

"The decree of this court will provide that the beneficiaries of the trust are entitled to the income from the trust fund from the date the executors came into possession of sufficient assets of the estate to justify them in setting apart the trust fund from the remainder of the estate."

In this state the statutes (Code 1932) relating to the distribution of estates are as follows:

8335. "No executor or administrator shall take, hold, or retain in his hands more of the deceased's estate than amounts to his necessary charges and disbursements, and such debts as he shall legally pay within eighteen months after administration granted; but all such estate so remaining shall, immediately after the expiration of eighteen months, be divided and paid over to the person or persons to whom the same may be due by law or by the will of the deceased."

8336. "But every legatee and distributee, before receiving his portion of the decedent's estate, or some other for him, shall give bond with two or more sufficient sureties, or one corporate surety, in a penalty double the amount of his share, payable to the state, conditioned that if any debt or debts truly owing by the deceased shall be afterwards sued for and recovered or otherwise duly made to appear, said legatee or distributee shall refund and pay his ratable part of such debt or debts out of the part or share so allotted to him."

■ These statutes are directory and not mandatory, and having been originally one act should be construed together. *Willeford* v. *Watson*, 59 Tenn. (12 Heisk.), 476; *Murgitroyde* v. *Cleary*, 84 Tenn. (16 Lea), 539.

In Sizer's Pritchard Law of Wills, 848, it is said:

"Taking the statutory provisions and the decisions thereon together, however, the result seems to be that the failure of the personal representative, out of court, to pay over a legacy or distributive share within two years and six months from the grant of administration, does not put him in default. He is not bound to wait so long; he may pay before, if justified by the condition of the estate; and if the assets of the estate are in money, or effects readily convertible into money, and there are no debts, he should pay over the legacies or shares without delay."

Again, on page 850, this statement is made:

"As already indicated, the statute is directory merely; the personal representative judges of the necessity of taking a refunding bond when application for the payment of a legacy or distributive share is made to him out of court; if he is willing to undertake that there are no debts and to take the risk of the subsequent recovery of judgment, he may distribute the estate without bond."

And on pages 856-857 the relationship of the executor and the legatee is thus stated:

"This subject has been adverted to already, and it has been shown that the will transfers merely an inchoate property to the legatees, which can only be made complete by the assent of the executor. The testator's personal property is devolved on the executor, to be applied, in the first place, to the payment of debts; and before he can safely pay legacies he is bound to see that a sufficient fund will be left for the demands of creditors. Consequently, as a protection to the executor, the law imposes the necessity of his assent to a legacy before it can vest absolutely; and if a legatee obtain possession of the thing bequeathed without the consent of the execu-

tor, the latter may maintain his action against him for its recovery. The assent of the executor when once given is considered a binding admission on his part that the funds remaining in his hands are competent for the payment of debts. This assent is necessary to effect such separation of the legacy from the body of the estate that it will no longer be subject to the debts of the testator, and to so perfect the inchoate title which the legatee derives from the will that he will be entitled to receive and retain the legacy, or demand and sue for its recovery if unlawfully withheld from him by another.''

 The executor having set up these trusts within ninety days after its qualification as directed in the will, and at a time when the assets remaining were more than sufficient to pay all debts, taxes, and legacies, it appears to us that there is no basis for requiring the trust legatees to contribute to the general legatees than there would have been for the latter to contribute to the former had the trust securities, instead of the bank stock, depreciated in value.

 It is contended that these trusts were wrongfully set up because at the time the inheritance taxes had not been paid. By the will that was made an obligation of the estate, and, as previously pointed out, the executor can pay legacies before discharging all the debts where sufficient assets are reserved for that. purpose. If it should turn out that the assets were insufficient for that purpose, it might result that the executor could be held personally liable. Code, sections 1291, 1292. But conceding that the executor acted improperly in setting up these trusts before paying the inheritance taxes, we come back to our original proposition that the law affords no remedy for the recovery of these trust legacies by either the

executor or the general legatees. There might be 'exceptions in cases where compulsion, fraud, or other iniquitous conduct appears in the transaction.

█ The Court of Appeals, while conceding that the executor acted in good faith in the establishment of these trusts, takes the position that to accord to an executor-trustee such authority opens up the way for much favoritism between legatees. In this view we are unable to concur. The executor was simply following the directions of the will. Instead of disposing of $50,000 of securities and investing the proceeds in other securities, it transferred securities on hand, suitable for trust investment, and at their market value, to itself as trustee. Its transactions and accounts were subject to inspection by the interested parties, and we see in such transactions no opportunity for favoritism or fraud. In fact, opposing counsel very frankly concedes in his brief that the method by which the executor set up these trusts was perfectly legitimate and proper. His complaint is limited solely to the time of the transfer, his contention being that if the executor had waited eighteen months, as provided by the statute, the deficiency of assets would have become apparent, and the trust legacies would have had to abate with the general legacies. But for the direction in the will that these trusts be set up within ninety days, this contention would be plausible. Even so, counsel has submitted no authority that would support an action by the executor or general legatees to recover trust funds paid prematurely to the trustee.

Having concluded that the five trusts were properly set up as directed in the will, and that same cannot be recovered, or the beneficiaries thereof required to abate

their legacies, it becomes unnecessary to determine the other questions presented by the assignments of error.

For the reasons stated, the decree of the Court of Appeals will be reversed and that of the chancellor affirmed.

The costs will be paid by the executor out of the assets of the estate.