IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 9, 2011 Session

## JENNIFER JEFFREY STANCIL v. PAUL EDWIN STANCIL

**Appeal from the Circuit Court for Hamilton County**
**No. 09D1245      W. Neil Thomas, III, Judge**

---

**No. E2011-00099-COA-R3-CV-FILED-JANUARY 13, 2012**

---

Jennifer Jeffrey Stancil ("Wife") filed for divorce against her husband, Paul Edwin Stancil ("Husband"), in the Circuit Court for Hamilton County ("the Trial Court"). In the course of the divorce, Wife filed a motion for temporary alimony. Husband, in his response to Wife's motion, alleged that an antenuptial agreement precluded Wife from receiving any alimony. Wife asserted that the antenuptial agreement was invalid. After a trial, the Trial Court held that the antenuptial agreement was enforceable. Wife appeals. We hold that, as Wife was misled into signing the antenuptial agreement and adequate disclosure was not made, the antenuptial agreement is invalid. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, J., joined. CHARLES D. SUSANO, JR., J. filed a separate opinion concurring in part and dissenting in part.

Michael R. Campbell and Lauren M. Rutherford, Chattanooga, Tennessee, for the appellant, Jennifer Jeffrey Stancil.

Robert W. Sauser, Chattanooga, Tennessee, for the appellee, Paul Edwin Stancil.

# OPINION

## Background

Wife filed for divorce against Husband in June 2009. Husband filed an answer and counterclaim in response. Wife also filed a motion for temporary alimony. Husband responded, arguing that Wife had waived any claim to alimony in an antenuptial agreement. In September 2009, the Trial Court granted Husband's motion to bifurcate the issue of the antenuptial agreement. Trial on the validity of the antenuptial agreement was held in June 2010.

Four witnesses testified. First to testify was Wife. Wife testified that she attended high school only through the tenth grade and did not graduate from high school. Wife had neither a high school diploma nor a GED. Wife received no formal education beyond the tenth grade. Wife met Husband in January 2001. Wife subsequently moved in with Husband. Wife stated that she essentially possessed only her clothes and some furniture at that time. Husband worked at an insurance company. Wife affirmed that Husband "called the shots" in the seven month period leading up to the signing of the antenuptial agreement.

Wife testified that Husband asked her to marry him in August 2001. On New Year's Eve, 2001, Husband told her that they needed to execute a contract so that Wife would not "be on his property." According to Wife, Husband told her that this was due to Wife's poor credit history and the prospect that her poor credit history could hinder his ability to obtain a loan. Wife testified that Husband told her that the document was "like a prenup" but in reality its only purpose was related to the loan. According to Wife, Husband said that he would not list one of his properties, St. Elmo, in the agreement, and, that this would have the effect of invalidating the agreement.

Wife insisted that her personal counselor, Doctor Charles M. Nies ("Dr. Nies"), hear what Husband was proposing. A meeting took place involving Wife, Husband, and Dr. Nies. Wife testified that she wanted Dr. Nies to be a witness to what Husband was telling her. Wife stated:

> We explained about that we were getting a contract signed. And Paul had told him [Dr. Nies] everything that he told me about that it's not going to hold water and that he was going to leave off one of his properties so that it wouldn't be - - it wouldn't be considered a pre - - it wouldn't be a legal thing because he would hold off one of his properties.

The next day, Husband and Wife went to see attorney Brent James ("James")

to sign the agreement. Wife testified that Husband told her not to tell James what they were doing or else James would not go along with it. Wife stated that she was alarmed by this statement. When Wife looked at the agreement, she scanned the document for Husband's property located at St. Elmo. Wife wanted to confirm that St. Elmo was not listed in the agreement as Husband had told her he would do. However, "St. Elmo", as it happens, apparently represented an area of Chattanooga and not a street address as Wife believed. Wife stated on cross-examination regarding how she knew St. Elmo was not listed in the agreement: "After all these years and now with the legal counsel and trying to figure it out, I'm assuming that the 22 Twelfth Avenue or whatever is in St. Elmo. I thought St. Elmo was an address, a street; and that's what I looked for." Wife testified that she would not have signed the agreement had she known that Husband intended for it to be enforceable. The antenuptial agreement was signed by Wife and Husband on January 4, 2002.

Husband testified next. Husband stated that he had an ownership interest in an insurance company. Husband denied ever telling either Wife or Dr. Nies that he intended to leave something out of the antenuptial agreement so that it would be invalid. Husband stated that his purpose in securing the antenuptial agreement was to protect the interests of his children from an earlier relationship and to protect his business. Husband testified that Wife asked him to tear up the antenuptial agreement many times.

Dr. Nies testified next. Dr. Nies stated that he had a PhD in psychology and was a practicing clinical psychologist with forty years of experience. His meeting with Wife and Husband lasted between 45 and 60 minutes. Dr. Nies stated that Husband said the reason for the agreement was to protect his credit score and make it easier to secure a loan. Dr. Nies testified that Husband said he had intentionally left out property in order to make the agreement invalid. Dr. Nies's notes from the meeting were entered into the record. Dr. Nies's notes included, among other things, a reference to a "credit score." Dr. Nies acknowledged that his notes did not contain any reference to Husband stating that he would leave property out of the antenuptial agreement to render it invalid.

James testified. James, the attorney who prepared the agreement, stated that Wife and Husband had visited him together about the antenuptial agreement two to three times. James's notes from the time contain a reference to St. Elmo. James testified that Wife had opportunities to ask him questions about the agreement. James acknowledged that he had received a letter from Husband's then counsel warning him that, should the antenuptial agreement be deemed invalid, Husband would seek from James any money owed by Husband to Wife. On rebuttal, Wife testified that she had no contact with James before January 4, 2002, the date the antenuptial agreement was signed.

In July 2010, the Trial Court entered its order stating, *inter alia*, that adequate

disclosure was made and that the antenuptial agreement was valid. The Trial Court stated in its order that the St. Elmo property was disclosed, and, that even if full disclosure was not forthcoming, Wife primarily was interested in marrying Husband. In December 2010, the Trial Court entered an order stating that its July 2010 order, along with other orders denying the parties' respective motions to alter or amend, was a final, appealable judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. Wife appeals.

## Discussion

Though not stated exactly as such, Wife raises one issue on appeal: whether the Trial Court erred in holding that the antenuptial agreement between Wife and Husband was valid and enforceable.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

As pertinent to this appeal, Tenn. Code Ann. § 36-3-501 provides:

**36-3-501. Enforcement of antenuptial agreements.** – Notwithstanding any other provision of law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Tenn. Code Ann. § 36-3-501 (2010).

Our Supreme Court has instructed:

As we interpret the knowledge element of the statute, the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent, and value

-4-

of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

\* \* \*

The proponent has the burden of establishing the existence and terms of the agreement, as would be the situation in any other contractual setting.

*Randolph v. Randolph*, 937 S.W.2d 815, 821(Tenn. 1996) (citation omitted).

This Court in addressing the issue of what disclosure satisfies Tenn. Code Ann. § 36-3-501 has stated:

In cases where antenuptial agreements have been enforced, we have made clear that the basic question which must be answered is whether the spouse was misled, where the proponent of the agreement makes a fair disclosure, even if it [is] not 100% exhaustive, and the spouse had the opportunity to ask questions and discover the extent of the other's holdings but failed to do so due to lack of interest, then the agreement has been held valid. *See, e.g., Cantrell v. Estate of Cantrell*, 19 S.W.3d 842 (Tenn. Ct. App. 1999); *Wilson v. Moore*, 929 S.W.2d 367 (Tenn. Ct. App. 1996); *Kahn v. Kahn*, 756 S.W.2d 685 (Tenn. 1988). *Also see, Spurlock v. Brown*, 91 Tenn. 241, 18 S.W. 868 (1892).

*Reece v. Elliott*, 208 S.W.3d 419, 422 (Tenn. Ct. App. 2006). We also have explained:

While some state courts have resolved the issue differently, most courts have not construed the full and fair disclosure requirement to mandate detailed disclosures such as financial statements, appraisals, balance sheets, or the like. Thus, in the absence of fraud or overreaching, the inadvertent failure to disclose an asset or the unintentional undervaluation of an asset will not invalidate a prenuptial agreement as long as the disclosure that was made provides an essentially accurate understanding of the party's financial holdings. The disclosure will be deemed adequate if it imparts an accurate understanding of the nature and extent of a person's property interests.

*Wilson v. Moore*, 929 S.W.2d 367, 371 (Tenn. Ct. App. 1996) (citations omitted) (footnotes omitted).

The Trial Court stated in its July 2010 order that "the Court does not believe that the Plaintiff has maintained a showing of invalidity by clear and convincing evidence." We believe that this statement reflects the wrong standard in a case such as this one. Rather, Husband, as proponent of the antenuptial agreement, and in accordance with the principles espoused in *Randolph*, had the burden of proving the agreement's validity by a preponderance of the evidence.

Husband failed to carry his burden of proof. We first note that the Trial Court did not make specific findings of credibility. Wife testified that she was told by Husband that the antenuptial agreement would be invalid because Husband would leave one of his properties out of the agreement. Dr. Nies testified that Husband gave the same account to him. Husband, on the other hand, denied making these statements about sabotaging the antenuptial agreement. We find that the evidence preponderates in favor of a finding that Wife was misled by Husband into believing that the antenuptial agreement would be purposefully invalidated by Husband.

The preponderance of the evidence in the record shows a lack of good faith by Husband in the preparation and execution of the antenuptial agreement. The evidence demonstrates that Wife simply did not know that she was signing away the possibility of alimony as part of a valid contract. Rather, as supported by Wife's testimony and as corroborated by Dr. Nies, Wife believed she was signing an invalid agreement solely in order to assist Husband's effort to obtain a loan. Husband's bad faith underpins this antenuptial agreement.

Apart from, but related to, the misleading and bad faith manner by which Wife was induced by Husband to sign the antenuptial agreement, we also find that adequate disclosure was not made. As we have stated:

> The necessity of full disclosure and good faith rests on various principles. First, an agreement to marry gives rise to a confidential relationship and as such the parties to a given agreement "do not deal at arms' length and must exercise candor and good faith in all matters bearing upon the contract." (footnote omitted) Second, requiring full disclosure or knowledge helps to level the bargaining power when there is a disparity between the parties. Third, unlike other private contracts, "the State has an interest and is a party to every marriage." "In the absence of antenuptial agreements, state laws govern the division of marital property and the awarding of alimony in the event of divorce." Accordingly, it is appropriate that parties entering into such agreements do so with full knowledge of the holdings to which they are waiving any claim under state law.

Based on the foregoing principles, the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a "full and fair disclosure of the nature, extent, and value of his or her holdings was provided to the spouse seeking to avoid the agreement or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings." What constitutes "full and fair" disclosure must be determined from the circumstances of each case. Factors to be considered are (1) the relative sophistication of the parties, (2) the apparent fairness or unfairness of the substantive terms of the agreement, and (3) any other circumstance unique to the parties and their specific situation. Full and fair disclosure does not require that each and every asset be revealed with complete exactness, but it does require that each party be given a clear idea of the nature, extent, and value of the other party's property and resources. "Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself."

*Sattler v. Sattler*, No. M2007-02319-COA-R3-CV, 2008 WL 4613589, at *4 (Tenn. Ct. App. October 13, 2008) (citations omitted), *Rule 11 appl. perm. appeal denied April 27, 2009*.

Here, Wife clearly was disadvantaged with respect to sophistication. The record reflects that Wife, wishing to go ahead with getting married, was rushed into signing an antenuptial agreement which lacks values for Husband's listed assets. In any event, Wife, lacking independent counsel, was misled by Husband to believe that the agreement would be invalid as an antenuptial agreement. The evidence in this case reflects a fundamentally unfair, hurried, and opaque process by which Wife was misled by Husband to enter into this antenuptial agreement.

Husband argues that Wife was uninterested in financial matters and that values for Husband's assets would have been meaningless to Wife. We disagree. The testimony reflects that Wife was not deeply interested in Husband's finances for the purpose of deciding whether to marry Husband. Wife's relative indifference to Husband's finances for marriage purposes, however, is a distinct concept from indifference to finances for the purposes of disclosure in the context of her willingness to sign an antenuptial agreement. Wife, unsophisticated in legal or financial matters, and, with a limited awareness of Husband's financial status, including the value of his assets, underwent a haphazard, deceptive, and generally inadequate process leading up to the agreement.

Husband, as the proponent of the antenuptial agreement, failed to prove by a preponderance of the evidence that the antenuptial agreement was entered into freely,

knowledgeably, and in good faith. The Trial Court erred in holding that the antenuptial agreement was valid. We hold the antenuptial agreement to be invalid, and we reverse the judgment of the Trial Court.

## **Conclusion**

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellee, Paul Edwin Stancil.

_____
D. MICHAEL SWINEY, JUDGE