IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 7, 2005 Session

## LINDA DIANE STUTZ v. DAVID LARRY STUTZ

**Appeal from the Circuit Court for Hamilton County**
**No. 02 D 587     W. Neil Thomas, Judge**

---

**No. E2004-01399-COA-R3-CV - FILED AUGUST 23, 2005**

---

This case involves a divorce and the validity of a postnuptial agreement. Mr. and Ms. Stutz were married more than twenty years. During most of the marriage, they wanted to have children but were unsuccessful. When a child became available for adoption, Ms. Stutz was elated and aggressive in her actions to secure the adoption of the child, but Mr. Stutz was opposed to the adoption of the child. Over the course of several weeks, Ms. Stutz attempted to change Mr. Stutz's mind regarding the adoption. Finally, she suggested that in exchange for his consent to the adoption, they would enter into an agreement dividing the marital estate and in the event Mr. Stutz was unhappy being a father they would divorce and follow the agreement previously determined. The result was a lengthy postnuptial agreement, which among other things, divided the marital estate giving most of the marital property to Mr. Stutz. Within a few years of the signing of the postnuptial agreement and the adoption, Ms. Stutz filed for divorce. The trial court upheld the validity of the postnuptial agreement with the exception of a section which attempted to waive and/or significantly limit Mr. Stutz's child support obligation. The trial court also granted a divorce to the parties upon Mr. Stutz's motion without conducting an evidentiary hearing. Ms. Stutz appeals. We hold that the postnuptial agreement is invalid as it is contrary to public policy. We further hold that the trial court erred in granting a divorce to the parties in the absence of a stipulation to or proof of grounds for divorce. Accordingly, we reverse the trial court's decision and remand this case for a trial on the division of the marital estate, alimony, divorce, and any remaining issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed, Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which D.MICHAEL SWINEY, J., and GARY R. WADE, Sp.J., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the Appellant, Linda Diane Stutz.

Glenna M. Ramer, Chattanooga, Tennessee and Sarah Y. Sheppeard, Knoxville, Tennessee, for the Appellee, David Larry Stutz.

**OPINION**

I.

Linda Diane Stutz and David Larry Stutz were married on December 18, 1982. At the time of the marriage, Ms. Stutz, age 26, was working for a freight company and taking college classes at night. Later, she began working for the Tennessee Valley Authority. Mr. Stutz, age 34, had recently started a mechanical contracting business. Neither party had any significant assets or income. Ms. Stutz testified that Mr. Stutz was not drawing any income from the new company and that her salary paid their living expenses for a number of years. During the early years of this marriage, Mr. Stutz worked long hours away from the home at the new company in order to make it a success. Ms. Stutz was working full-time and going to school at night to advance her career. In short, much time was devoted by the parties to their respective careers. Mr. Stutz was an astute businessman and over the years, the company he started, Valley Mechanical, Inc., became very profitable. As the parties prospered financially, they began to travel extensively and acquire assets. In addition to their home in Chattanooga, they purchased a beachfront vacation home in Florida, lots on Watts Bar lake, a boat, jet skis, diamond rings, other jewelry, and several mink coats.

At the time of trial, Ms. Stutz was a programmer analyst for TVA, earning approximately $50,000 per year and Mr. Stutz operated Valley Mechanical, Inc, earning $1,082,552.00 in 1996, and $782,502.00 in 1995. The Stutzs had an adjusted gross income in 1997 of approximately $905,000 based on Ms. Stutz's salary at TVA, Mr. Stutz's earnings from Valley Mechanical, Inc., dividends, interest, real estate income, and other sources. During this marriage, Mr. and Ms. Stutz, by virtue of their perseverance and hard work, achieved great financial success and amassed a marital estate worth in excess of $11,000,000.

The parties wanted children, but were unable to conceive a child. Ms. Stutz testified that she had undergone three different surgical procedures in an attempt to become pregnant. She further testified that both parties underwent testing and sought help from two different fertility specialists. Ms. Stutz researched the possibility of *in vitro* fertilization, which they attempted, unsuccessfully, for a short period of time. Mr. Stutz testified that he was completely supportive of the many attempts to have a family and that he, too, desired to have children. At the age of 41, Ms. Stutz underwent a complete hysterectomy. After Ms. Stutz's hysterectomy in 1997, the parties ceased discussing the possibility of having a family.

However, this changed on February 27, 1998, when Ms. Stutz learned of a woman who was pregnant and wanted to surrender her child for adoption. Ms. Stutz was very enthusiastic about the prospective adoption, but was unable to discuss it with Mr. Stutz because he was in Europe on a business trip. On March 2, 1998, Ms. Stutz contacted Lane Avery, a Chattanooga attorney with the law firm of Gearhiser, Peters, Lockaby & Tallent, who had performed legal work for Mr. Stutz's business for many years. Ms. Stutz asked Mr. Avery if anyone in the law firm handled adoptions and was referred to another attorney within the same law firm, Terry Cavett. Ms. Stutz testified that she

and Ms. Cavett had multiple telephone conversations over the next few days about the process of an adoption.

When Mr. Stutz returned from Europe on March 9, 1998, Ms. Stutz told him of the prospective adoption. Ms. Stutz was disappointed to learn that Mr. Stutz was not supportive of the idea of the adoption. Ms. Stutz began trying to convince Mr. Stutz to agree to the adoption, but he continued to resist the idea. Despite Mr. Stutz's opposition, on March 11, 1998, Mr. and Ms. Stutz went to the adoption agency handling the adoption and were interviewed. Mr. Stutz continued to disagree with the idea of the adoption and advised the adoption agency that he believed he was too old and that his health was too poor to become a parent. Meanwhile, Ms. Stutz continued to communicate with Ms. Cavett almost daily regarding her progress with locating the birth father and handling the legal aspects of the adoption.

On Friday, March 13, 1998, the couple spent the weekend at their Florida vacation home. Following that trip, Mr. Stutz still had not changed his mind about the adoption and remained adamantly opposed to the idea. On Monday, March 16, 1998, Mr. Stutz contacted Ms. Stutz about an opportunity for a business trip in Puerto Rico with some friends beginning March 18, 1998. Ms. Stutz testified that she agreed to go, but that before leaving Chattanooga she contacted both Ms. Cavett and the adoption agency to inform them of her plan to be out of town for several days.

During the trip to Puerto Rico, Ms. Stutz testified that she called both Ms. Cavett and Peggy Lowe, the director of clinical services at Bethany Christian Services, every morning and every evening for an update on the baby who was due on March 20, 1998. The parties talked about the adoption on several occasions while in Puerto Rico. Mr. Stutz continued to argue against the adoption citing his age, his poor health, the stress caused by his job, the limitations the child would place on their ability to travel, and the financial responsibilities the child would impose on them. Ms. Stutz, concluding that Mr. Stutz's opposition was primarily based on financial concerns, proposed a solution - the parties would enter into an agreement for the division of their assets in the event of a divorce in exchange for Mr. Stutz agreeing to the adoption. Ms. Stutz testified that she suggested an agreement for a fair and equitable property division pursuant to which, other than child support, Mr. Stutz would have no other financial obligation to Ms. Stutz or to the child. Ms. Stutz also testified that her proposal was for the agreement to last one year and that, if within that one year period Mr. Stutz "hated" being a parent, he could walk away, obtain a divorce and the assets would be already divided per the agreement. Mr. Stutz testified that Ms. Stutz set all the parameters for the agreement and that she was only interested in receiving the martial residence, her furs, her jewelry, the Watts Bar Lake lots, a car and one million dollars. Mr. Stutz agreed to this proposal. At the time Ms. Stutz made this proposal she had not seen a financial statement of the parties' net worth. According to Mr. Stutz, upon their return from Puerto Rico, Ms. Stutz contacted Mr. Avery and asked him to begin drafting the postnuptial agreement. Ms. Stutz denies contacting Mr. Avery and denies ever discussing the postnuptial agreement with him except on the morning the agreement was signed. Mr. Avery had no recollection as to whether he consulted with Mr. or Ms. Stutz regarding the drafting of the postnuptial agreement although Mr. Stutz's pager number was on Mr. Avery's handwritten notes.

The baby girl, whom the parties intended to adopt and whom they had agreed to name LaShawn Danielle Stutz, was born on March 20, 1998 while the parties were in Puerto Rico. When Mr. and Ms. Stutz returned home on March 23, 1998, they went to Bethany Christian Services to see the baby. Ms. Stutz bonded with LaShawn immediately upon the baby being placed in her arms. The first visit with LaShawn lasted approximately two hours. Ms. Stutz testified as follows regarding their first visit with LaShawn:

> Mr. Lawrence: Just tell the Court what happened, then, on the 23rd. You're there at Bethany Christian Services and they bring LaShawn in. Just describe what happens on that occasion.

> Ms. Stutz: I had already felt like Shawnee was mine, but when they put her in my arms, all 15 years of disappointment was gone. She was mine just as much as if I had just given birth to that baby. We bonded instantly and she was everything I had ever hoped for in a child.

> And David was there, and I had asked him if he wanted to hold her, and he said he was nervous and afraid he would hurt her, and I said, "They're a lot tougher than you think," and he held her. And it was the family I had dreamed of my whole marriage and it was coming to pass right there. She put her little hand around one of his fingers and he just seemed so tender toward her. I mean, I knew that he would love her, if he didn't already. He just seemed to melt right there.

On March 24, 1998, a preliminary home study was conducted by the adoption agency and Mr. and Ms. Stutz were present in the home and participated. Ms. Stutz continued to visit with LaShawn on March 25th, and on March 27th, spending three to four hours with the child on each occasion. On March 29, 1998, Mr. and Ms. Stutz signed the application for adoption with Bethany Christian Services.

While the Stutzs were pursuing the adoption and represented by Terry Cavett, Lane Avery was drafting the postnuptial agreement. Lane Avery had represented Mr. Stutz's business interests since 1983, and done some estate planning for the parties. Mr. Avery was also a social acquaintance of the parties, had visited their Florida home on more than one occasion, and had accompanied them on a pleasure trip to San Francisco. From billing records of the law firm, it appears that legal work on the postnuptial agreement began on March 24, 1998. When asked who he was representing in the

drafting of the postnuptial agreement, Mr. Avery responded that he did not represent either party, but that he merely drafted the parties' agreement. However, a letter was introduced into evidence from Mr. Avery to Mr. Stutz dated March 30, 1998, which outlined Tennessee law regarding postnuptial agreements and made references to their discussions regarding limitations on Mr. Stutz's child support obligation. Mr. Stutz testified that he did not seek independent legal advice because he knew he could rely on Mr. Avery. When asked whether he consulted with Ms. Stutz regarding this agreement, Mr. Avery testified as follows:

> Mr. Lawrence: Do you have any memory of speaking with Linda Stutz about this agreement prior to its being drafted?

> Mr. Avery: I have no particular memory of speaking with either Linda Stutz or David Stutz concerning this agreement during its preparation. However, I must have spoken to one or the other of them.

> Mr. Lawrence: Is there any correspondence in your file addressed to Linda Stutz giving her a proposed draft of this Marital Property and Settlement Agreement to review and edit?

> Mr. Avery: I have seen no specific letter addressed to Mrs. Stutz.

> Mr. Lawrence: Insofar as your billing records are concerned, I understand your testimony to be that you can find no specific reference to the generation of this document?

> Mr. Avery: I recall no specific reference to the generation of the document.

Pat Murchison, Mr. Stutz's accountant for many years, testified that he was contacted by Mr. Avery who asked him to meet with Mr. Stutz to prepare an "accurate financial statement." Mr. Avery stressed the importance of full disclosure. He further testified that he did meet with Mr. Stutz and that they put the financial statement together and then forwarded it to Mr. Avery.

According to Ms. Stutz, there had been no mention of the agreement by either party since their return from Puerto Rico and she had not pursued the idea. However, on either March 30th or

31st, Mr. Stutz came home and presented Ms. Stutz with a postnuptial agreement.  As to when she received the postnuptial agreement for the first time, Ms. Stutz testified:

> Ms. Stutz:  I believe it was the following Monday or Tuesday night.  We hadn't talked about anything about it.  We had talked about LaShawn.  I knew the court date.[1]  I had told him when the court date was.  We had all this stuff lined out.  I had taken off from work.  I mean, everything was set.
>
> And he came in from work one evening and just threw this agreement down on the couch, and he said, "This is the agreement."
>
> And I - - "What?"
>
> And he said, "This is the agreement.  This is all you're getting from me.  You're not getting anything else.  I suggest you read it."  So I did.

Ms. Stutz further testified that she was shocked to see the financial disclosure and how much money they had.  She said she was aware they had a high standard of living, but was surprised to see what they were worth.  Ms. Stutz testified that while she had signed tax returns in the past she had never reviewed them prior to signing and that she had always trusted her husband to handle their finances and never felt the need to ask questions.  When asked on direct examination about her reaction to the agreement presented to her by Mr. Stutz, she testified that it was nothing like the agreement she had suggested to him in Puerto Rico.  Further, she testified that with respect to the parts she could understand, she knew the document was giving Mr. Stutz the bulk of the marital estate.  On April 1, 1998, Ms. Stutz attempted to contact a lawyer to review the agreement, but was unsuccessful.

On the morning of April 2, 1998, the birth mother was to appear before the trial court and surrender her parental rights to the baby.  Mr. and Ms. Stutz were to appear later that same morning to accept the surrender, receive guardianship and physical custody of the child.  Before appearing in court, however,  Mr. and Ms. Stutz went to the law office of Lane Avery for the purpose of signing the postnuptial agreement.  Ms. Stutz testified that on the way to Mr. Avery's office she told Mr. Stutz that she had been unable to talk to a lawyer and asked that they postpone the signing of the agreement until she could consult with legal counsel.  According to Ms. Stutz, Mr. Stutz said, "No.  That kid is not coming in my house unless this is signed today."  Ms. Stutz testified to the following regarding her emotional state upon arriving at Mr. Avery's office:

---

[1] Ms. Stutz is referring to the April 2, 1998, court date wherein the parties were to accept the surrender of LaShawn and receive physical custody of her.

Mr. Lawrence: So you arrived at the - - you had this conversation with David in the car on the way to Lane Avery's office, correct?

Ms. Stutz: Uh-huh. Yes. We drove and that was pretty much it. I mean, after he said no, I'm not postponing it, this kid is not coming into this house, I knew I had to sign or I would never see my baby again.

Mr. Lawrence: How did you feel about that.

Ms. Stutz: I was sick. I was just - - I remember feeling really light-headed and - - just the emotion of the adoption would have been one thing. I was terrified the birth mother would not show; she might change her mind at the last minute, something. I had never been this close to being a mother. I had never been anywhere near. And Shawnee was literally an hour or so away from me being her mother, her being my little baby, I had originally thought, us being a family.

. . . .

Mr. Lawrence: I want to focus, though, on what caused you to sign this agreement that you knew to be unfair.

Ms. Stutz: I had held Shawnee. She had my heart in her hand. I was her mother as much as any mother is to their child. Had David been holding a knife to her throat, I would have not felt any differently. I would have never seen that baby again. I know that. He was not going to postpone. That's - - that was definite. I was at the crossroads. I could either sign this document, bring my child home, or refuse to sign and never see her again.

-7-

Once they arrived at Mr. Avery's office, Mr. and Ms. Stutz were escorted to a room to read and sign the postnuptial agreement. Present in the room with them were Mr. Avery, Mr. Murchison, attorney Jerre Mosley, and two women who were witnesses to the Stutzs' signatures. Mr. Murchison testified that Mr. Avery was clearly in charge of the meeting and that he asked both Mr. and Ms. Stutz to read each page of the agreement and execute the document. Before the agreement was signed, Ms. Stutz asked that the following sentence be added, "In the event of divorce, Mrs. Stutz shall be entitled to sole custody of any adopted child."

The postnuptial agreement consists of 14 pages plus Exhibit A, which is a description of the marital assets with their values. The postnuptial agreement provides in pertinent part:

**MARITAL PROPERTY
AND SETTLEMENT AGREEMENT**

THIS MARITAL PROPERTY AND SETTLEMENT AGREEMENT, made this 2nd day of April, 1998, by and between **DAVID L. STUTZ**, a resident of Florida (hereinafter referred to as "Mr. Stutz"), and **LINDA D. STUTZ**, a resident of Hamilton County, Tennessee (hereinafter referred to as "Mrs. Stutz"),

W I T N E S E T H:

THAT WHEREAS, Mr. and Mrs. Stutz are husband and wife, being lawfully married on December 18, 1982; and

. . . .

WHEREAS, Mr. and Mrs. Stutz now, through the execution of this Marital Property and Settlement Agreement ("Agreement"), desire to (i) mutually attempt to preserve their marriage and promote harmony in their marital and family relationships, and (ii) solemnize in writing their understanding and agreement which was reached in an effort to reconcile all of their disputes and disagreements, the parties acknowledging that this Agreement accurately defines and sets forth the respective rights of each of them in and to their respective properties and all jointly held property in the event of any subsequent divorce during the term hereof; and

. . . .

WHEREAS, the parties consider themselves to be capable of providing their own support by virtue of their current estates and by virtue of their management and employment skills, experience and education; and

. . . .

NOW, THEREFORE, in consideration of the premises and mutual covenants and conditions hereinafter set forth, the parties agree as follows:

1. **Payment**.  In consideration of Mrs. Stutz's agreements as set forth herein, and other good and valuable consideration, Mr. Stutz agrees to pay to Mrs. Stutz the sum of $100,000.00 within fifteen (15) days of the date of this Agreement. Such amount may be paid to Mrs. Stutz by and through a deposit by Mr. Stutz of such amount (which deposit may constitute a contribution of in-kind assets) into an account established in the name of Mrs. Stutz.

. . . .

2. **Financial Disclosure; Marital Property**.

. . . .

(c) . . . Mrs. Stutz expressly acknowledges that during each of the last three calendar years Mr. Stutz has received as W-2 compensation from his business organizations amounts not less than the following: (i) for 1996, $1,082,552.00, (ii) for 1995, $782,502.00, and (iii) for 1994, $192,263.00, all of which compensation has been reflected on the corresponding federal income tax returns, Form 1040.  With respect to the 1997 calendar year, Mrs. Stutz expressly acknowledges that Mr. Stutz received as W-2 compensation from his business organizations amounts not less than $620,000.00.  In addition to the W-2 compensation which Mr. Stutz receives each year, Mrs. Stutz recognizes and acknowledges that Mr. Stutz receives a substantial amount of rental income each year, all of which is also reflected on the corresponding federal income tax returns, Form 1040.

. . . .

4. **Term of Property Settlement Agreement**.  The specific provisions of Paragraphs 5, 6, 7, and 8 of this Agreement shall only apply in the event the parties should separate or otherwise terminate their marriage at any time during the period beginning as of the date hereof and ending as of the date which is nineteen (19) years following the date hereof (hereinafter the "Term") . . . .

5. **Effect of Separation or Termination of Marriage by Divorce**. In the event of the parties' marital separation during the Term, or if

-9-

the marriage between the parties is during the Term terminated by divorce, annulment or by any means other than the death of one of the parties, each of the parties agree as follows:

(a) Each party hereby waives, quitclaims, releases and relinquishes all rights to claim temporary or permanent alimony, support, separate maintenance, payment of expenses or debts, payment of attorneys fees, benefits and any interest in the Separate Property of the other to the fullest extent permitted under the laws of the State of Tennessee or the jurisdiction governing the enforcement of this Agreement. . .
. . . .

6. **Distribution and/or Division of Marital Property**. In the event of the parties' marital separation during the Term, or if the marriage between the parties is during the Term terminated by divorce, annulment or by any means other than the death of one of the parties, each of the parties agrees that the parties' Marital Property, including, but not limited to the property reflected on Exhibit A attached hereto, shall be distributed to and divided between the parties as follows:

(a) **Property titled in Mr. Stutz's Name**. All property titled in the sole name of Mr. Stutz, including, but not limited to, (i) all shares of stock in Valley Mechanical, Inc., (ii) all other ownership interests in those other miscellaneous business organizations and entities owned by Mr. Stutz, including, all business entities owned by Mr. Stutz in his individual name as now described on collective Exhibit A, and (iii) all real estate described on collective Exhibit A owned by Mr. Stutz in his individual name, shall be retained by and deemed owned solely by Mr. Stutz. Mrs. Stutz hereby specifically waives, quitclaims, releases and relinquishes any and all rights, title and interest that she may have, or claim to have, in any such property, and Mrs. Stutz further agrees that she is not entitled to receive any value or compensation with regard to, or in exchange for, any such rights, title and interest that she may have or have had at any time in such property.

(b) **Property Titled in Mrs. Stutz's Name**. All property titled in the sole name of Mrs. Stutz shall be retained by and deemed owned solely by Mrs. Stutz. Mr. Stutz hereby hereby specifically waives, quitclaims, releases and relinquishes any and all rights, title and interest that he may have, or claim to have, in any such property, and Mr. Stutz further agrees that he is not entitled to receive any value or

-10-

compensation with regard to any such rights, title and interest that he may have or have had at any time in such property.

(c) **Real Estate**. As reflected on <u>Exhibit A</u>, the parties currently jointly own (i) a house, personal property and real property located at 1803 Glenn Oaks Place, Chattanooga, Tennessee, (ii) a house, personal property and real property located at 8759 Highway C38, Seagrove, Florida, and (iii) two unimproved lake lots located in Watts Bar Estate on the Tennessee River. Except as otherwise provided herein, Mrs. Stutz shall be entitled to the real estate and furniture and her personal property at 1803 Glenn Oaks Place (or the home then occupied by the parties as their principal residence) and the two (2) Watts Bar Estate lots. In any and all events, Mr. Stutz shall be entitled to sole ownership of the personal property and real estate located in Seagrove, Florida (even if serving as their principal residence). Mr. Stutz shall be responsible for the monthly mortgage payments attributable to all such real estate.

(d) Automobiles. Mrs. Stutz shall be entitled to the Chevrolet Corvette, or any successor automobile then driven principally by her. Mr. Stutz agrees to continue to provide Mrs. Stutz, for such time as she is personally able to drive, with the use of an automobile, of such type, make and model, as Mr. Stutz shall, in good faith, deem to be appropriate. . . .

.   .   .   .

7. **Annual Payments to Mrs. Stutz**.

(a) . . . Mr. Stutz agrees to pay to Mrs. Stutz the following: (i) the sum of $100,000.00 per year during the period of any such separation, not to exceed a maximum period of ten (10) years, or (ii) the sum of $100,000.00 per year for a term not to exceed a maximum of 10 years from the date of any divorce.

(b) The obligation of Mr. Stutz to make any annual payments hereunder shall immediately terminate and expire upon the earlier of the following events: (i) the death of Mrs. Stutz, or (ii) the remarriage of Mrs. Stutz. . . .

(c) Mr. Stutz's payment obligations pursuant to this Paragraph 7 shall not at any time ever exceed a total cumulative payment of One Million Dollars ($1,000,000.00). . .

-11-

(d) This $100,000.00 per year amount payable pursuant to this Paragraph 7 shall be paid in equal consecutive monthly installments of $8,333.33, payable on or before the 10th day of each month, and such payments shall be deemed to constitute rehabilitative alimony, deductible to Mr. Stutz and included as income to Mrs. Stutz.

(e) Mrs. Stutz shall not be entitled to any additional payments or amounts, except as otherwise specifically provided in this Agreement, it being expressly understood and acknowledged that Mrs. Stutz hereby specifically waives, quitclaims, releases and relinquishes any and all rights she may have to claim any temporary or permanent alimony, support, separate maintenance, other than the amounts specifically set forth in this Paragraph 7.

8. **Health Insurance**. . . .

(a) Mr. Stutz shall provide health insurance coverage for (i) Mrs. Stutz until such time as she shall reach age 65, and (ii) the parties' children, if any, until such child or children reaches age eighteen (18) years or graduates from high school, whichever is later. . . .

(b) Each party will pay ½ of any medical, dental, orthodontic, optical or other medical or health related expenses of Mrs. Stutz or any child which are not covered by any available insurance. . . .

.    .    .    .

13. **Acknowledgment by Parties; Representation by Counsel**. . . Further, both parties hereby waive any potential conflict of interest that the law firm of Gearhiser, Peters, Lockaby & Tallent, PLLC, may have in the preparation of this Agreement and hereby release and waive any claim they have or could assert against such firm by reason of perceived or alleged joint representation of the parties. Mr. and Mrs. Stutz acknowledge that they have furnished complete and accurate information to each other regarding their assets and that Gearhiser, Peters, Lockaby & Tallent, PLLC, has been requested to reduce to writing their prior agreement and understanding with regard to their property and its disposition in the event of their death, divorce or separation. Both parties represent that they have not sought individual advice from Gearhiser, Peters, Lockaby & Tallent, PLLC, that would be adverse to the other party's rights and that Gearhiser, Peters, Lockaby & Tallent, PLLC, has encouraged both parties to have independent legal counsel review this Agreement on their respective behaves. Both parties acknowledge that they have had the

opportunity to retain separate counsel to advise them relative to their right and obligations under this Agreement. Mrs. Stutz specifically and expressly represents that she has had her legal counsel review this Agreement, and that both she and her legal counsel agree that the terms of this Agreement are valid, binding and enforceable.

.    .    .    .

22. **Child Support**.

.    .    .    .

(c) While the parties understand that Mrs. Stutz may not legally be entitled or permitted to forgive or release Mr. Stutz from any such child support obligations under applicable Tennessee law (although she acknowledges that she would immediately do so if Tennessee law allowed), it is the parties express intent and desire that Mrs. Stutz pursuant to the terms thereof hereby expressly assumes any and all of Mr. Stutz's child support obligations, if any, which may at any time exceed a total of $2,100.00 per month. In consideration of (i) Mr. Stutz's agreements as set forth in this Agreement, (ii) Mr. Stutz's agreement to adopt a child or children, (iii) the $100,000.00 payment to Mrs. Stutz described in Paragraph 1 above, and (iv) such other good and valuable consideration, Mrs. Stutz hereby expressly and voluntarily assumes, and is personally and individually responsible for, any and all such child support obligations of Mr. Stutz with respect to any adopted child or children which may at any time be in excess of the cumulative amount of $2,100.00 per month. If in the future Mrs. Stutz may lawfully waive or release Mr. Stutz from child support obligations in excess of $2,100.00 per month, the terms of this Agreement shall at that time be immediately construed to permit and effect such waiver and release.

(d) Mrs. Stutz agrees to indemnify and hold Mr. Stutz harmless from any and all liability for any claims, suits, obligations, or attorney fees, which may arise out of or from her failure to assume and take responsibility for (i) all child support obligations in excess of a total of $2,100.00 per month, and (ii) to timely satisfy all such child support obligations in excess of a total of $2,100.00 per month.

.    .    .    .

(f) If and to the extent that Mr. Stutz shall at any time be required to pay any amounts in excess of the total amount of $2,100.00 per month as child support for any child or children of the parties, any such child support obligation shall first be satisfied from and through

-13-

the amounts otherwise being paid to Mrs. Stutz pursuant to Paragraph 7 above, and the amount payable to Mrs. Stutz pursuant to Paragraph 7 above shall be reduced by such child support payments. . . .

. . . . .

In addition, the following was handwritten at the end of the postnuptial agreement and initialed by both parties: "In the event of divorce, Mrs. Stutz shall be entitled to sole custody of any adopted child."

In summary, the following is a list of the assets, their division provided by the postnuptial agreement and their values as set forth in Exhibit A of the postnuptial agreement:

| Asset | Mr. Stutz | Ms. Stutz |
|---|---|---|
| Valley Mechanical, Inc. stock | $4,000,000 | |
| Valley Mechanical of Tennessee, Inc. stock | 300,000 | |
| Metal Products, Inc. stock | 300,000 | |
| Superior Insulation Co., Inc. stock | 0 | |
| Valley Precision Machine, Inc. stock | 100,000 | |
| Fantasea Enterprises, LLC interest | 29,500 | |
| Valley Specialties interest | 0 | |
| Quality Pipe & Supply, Inc. stock | 0 | |
| Harbor Docks Seafood & Brewery, LLC | 100,000 | |
| DLS General Contractors, Inc. | 0 | |
| Rossville, Georgia real property | 1,200,000 | |
| Rome, Georgia real property | 350,000 | |
| Seagrove, Florida commercial real estate | 649,000 | |
| Seagrove, Florida residential real estate | 89,500 | |
| Watts Bar Estate lots | | 190,000 |
| Evergreen Management Account | 1,300,047 | |
| Valley Mechanical retirement plan | 98,000 | |
| TVA Retirement Plan | | 25,000 |
| Automobile | | 0 |
| Marital Residence | | 240,000 |
| Florida Residence | 1,300,000 | |
| 1313 Blocker Lane, East Ridge (real estate) | 180,000 | |
| Cedar Village Apts. (real estate) | 400,000 | |
| Total | 10,396,047 | 455,000 |

-14-

Total value of the marital estate: $10,851,047[2]

Percentage of the marital estate          95.81%                    4.19%[3]

In addition to the postnuptial agreement executed by the parties, a second document was also executed at the office of Mr. Avery on the morning of April 2, 1998. Attorney Jerre Mosley testified that on the evening of April 1, 1998, he received a phone call from Pat Murchison asking him to appear the next morning at 7:00 a.m. at Mr. Avery's office. Mr. Mosley testified that he did not know the purpose of his attendance at the meeting and had never met Mr. or Ms. Stutz. When he arrived in Mr. Avery's office conference room, he saw a letter lying on the conference room table addressed to him. Mr. Mosley testified that he had not drafted the letter. Mr. Stutz insisted in his testimony that Ms. Stutz had drafted the letter and that he had no responsibility for the letter. Ms. Stutz testified that she did not prepare the letter, that she had never seen the letter prior to arriving at Mr. Avery's office, and that she had never met Mr. Mosley prior to April 2nd. Mr. Mosley testified that he made some changes himself to the letter, and was absent from the meeting approximately 30 minutes and then returned to Mr. Avery's office with the corrected letter. The final copy of the letter was as follows:

DAVID & LINDA STUTZ
CHATTANOOGA, TENNESSEE

April 2, 1998

Mr. Jerre Mosley
Duncan, Mosley & Warren
701 Market Street, Suite 1000
Chattanooga, Tennessee 37402

Dear Mr. Mosley:

It is our request that you be the custodian of two packages given to you by Mr. Lane Avery on the morning of April 2, 1998. You are to hold these packages until such time as a Final Order of Adoption is entered at which time you will in all events release package 1 to Mr. Stutz and package 2 to Ms. Stutz. If prior to the entry of the Final

---

[2] This total value does not include household furnishings at either the Florida or Tennessee residence, the boat, jet skis, jewelry, furs, clothing or other personal property. Ms. Stutz has four furs which cost a total of $89,000. Mr. Stutz testified that he also owns a fur coat, though he did not testify as to its value. Mr. Stutz testified he purchased a $300,000 ring for Ms. Stutz and a $156,000 ring for himself.

[3] These percentages do not include the value of a car for Ms. Stutz, her health insurance or medical costs, the $100,000.00 payable to Ms. Stutz within 15 days of the execution of the document, or the $1,000,000 payable to Ms. Stutz over a period of 10 years.

Order of Adoption, the adoption is not consummated through no fault of David Stutz, you are authorized and directed to release package 1 to Mr. Stutz and package 2 to Mrs. Stutz. The determination of whether or not David Stutz is at fault in terminating the adoption process shall be determined by Bethany Christian Services whose determination shall be conclusive and binding.

Notwithstanding the foregoing, if Linda Stutz institutes divorce proceedings before the adoption is finalized, you are authorized and directed to release package 1 to Mr. Stutz and package 2 to Mrs. Stutz. If David Stutz institutes divorce proceedings before the adoption process is finalized, you are directed to shred the contents of both packages.

Signed this 2nd day of April, 1998.

_____/s/ Witness_____                    _____/s/ David Stutz_____


_____/s/ Witness_____                    _____/s/ Linda Stutz_____


Immediately following the execution of the two documents at Mr. Avery's office, Mr. and Ms. Stutz went to court to accept legal guardianship of LaShawn and then went to Bethany Christian Services to take physical custody of LaShawn.

Throughout this litigation, Mr. Stutz has admitted that he would never have agreed to the adoption of this child without Ms. Stutz signing the postnuptial agreement. Mr. Stutz testified at a deposition, which was read into evidence at the hearing, to the following:

Mr. Lawrence:     Would you say that the adoption of LaShawn became conditioned upon the execution of this agreement, that were it not for the execution of this agreement you weren't going to participate in LaShawn's adoption?

Mr. Stutz:     That's correct.

Mr. Lawrence:     Did you make that known to Linda Stutz?

Mr. Stutz:     I'm sure I did.

As per the postnuptial agreement, and in consideration for said agreement, Mr. Stutz forwarded to Ms. Stutz $100,000 within fifteen (15) days of signing the agreement.

The adoption proceeded and a final order of adoption was entered on March 15, 1999. On May 12, 1999, Mr. Mosley forwarded both packages to Mr. Avery with a letter stating that both Mr. and Ms. Stutz had requested their respective package be sent to him.

Despite his initial opposition to the adoption, Mr. Stutz testified at trial that he now believes LaShawn is, "the greatest thing that ever happened to me. She's the love of my life." It is abundantly clear that LaShawn is loved by both her parents.

Nearly three years after the adoption was final, on March 14, 2002, Ms. Stutz filed for divorce alleging irreconcilable differences and inappropriate marital conduct. In his answer, Mr. Stutz admitted that irreconcilable differences existed, but denied that he was guilty of inappropriate marital conduct. On February 24 and 26, 2003, the trial court conducted a hearing regarding the validity of the postnuptial agreement. Final arguments were heard on April 25, 2003, and the case was taken under advisement. Subsequently on June 2, 2003, the trial court issued an order, upholding the validity of the postnuptial agreement, but finding paragraph 22, the provision regarding child support, to be void and unenforceable. The trial court entered an order on July 2, 2003, declaring that Mr. and Ms. Stutz were divorced pursuant to Tenn. Code Ann. § 36-4-129(b), following a hearing on a motion filed by Mr. Stutz requesting that the parties be divorced. The order reserved for further hearing all other issues not previously addressed. On May 13, 2004, an order was entered on issues of child support and parenting. On May 27, 2004, an order was entered regarding summer vacation and parenting time. Ms. Stutz filed a notice of appeal on June 3, 2004 regarding the order upholding the validity of the postnuptial agreement and the order granting a divorce. On June 10, 2004, Mr. Stutz filed a motion to alter or amend and/or for a new trial regarding various matters including child support, attorney's fees, and counseling for the child. Mr. Stutz filed a notice of appeal on June 11, 2004, appealing the final judgment of May 13, 2004. On August 30, 2004, the trial court entered an order denying Mr. Stutz's motion to alter or amend stating that upon the filing of the notice of appeal by Ms. Stutz, the trial court was deprived of jurisdiction to determine the motion to alter or amend.

II.

Ms. Stutz raises two issues on appeal which we restate: (1) Whether the trial court erred in holding that the postnuptial agreement was valid and, (2) whether the trial court erred in decreeing a divorce to the parties absent proof of fault or stipulation by both parties.

III.

The parties in this appeal are well-represented by counsel and present compelling arguments in support of their positions. Ms. Stutz argues that the trial court erred in holding the postnuptial

agreement valid. She asserts that the postnuptial agreement violates public policy because part of the consideration for the postnuptial agreement was Mr. Stutz's agreement to adopt the child. Further, she argues that the postnuptial agreement was invalid because it was obtained through duress and undue influence and is unconscionable due to its gross inequity. Also, Ms. Stutz argues that the trial court erred in decreeing a divorce between the parties without an evidentiary hearing or stipulation by both parties.

Mr. Stutz counters that the postnuptial agreement does not violate public policy in that Tenn. Code Ann. § 36-1-109 regarding illegal payments in connection with placement of a child for adoption does not apply to the situation before the court. He asserts that he was not compensating someone for surrendering a child but, rather, was entering into an agreement so that a third party could surrender a child to Ms. Stutz. Mr. Stutz submits that the agreement satisfies the requirements of *Bratton v. Bratton*, 136 S.W.3d 595 (Tenn. 2004). Finally, Mr. Stutz argues that the divorce decree was properly entered based upon Mr. Stutz's admission of grounds for divorce.

IV.

This is a non-jury case and, accordingly, our review is de novo upon the record of the trial court without any presumption of correctness attaching to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996) and Tenn. R. App. P. 13(d). We must, however, presume the trial court's factual finding to be correct absent evidence preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

V.

As a general rule, postnuptial agreements are valid in Tennessee. *Bratton v. Bratton*, 136 S.W.3d 595, 599 (Tenn. 2004). Postnuptial agreements seek to determine the rights of each spouse in the other's property, spousal support, and related issues in the event of death or divorce. *Black's Law Dictionary* 1167 (6th ed. 1990). Postnuptial agreements are generally treated in the same manner as antenuptial and reconciliation agreements.

Postnuptial agreements should be interpreted and enforced as any other contract. *Bratton* at 599. As such, they must be supported by adequate consideration. *Id.* Generally, consideration for a contract may be either a benefit to the promisor or a detriment to, or an obligation upon, the promisee. *See Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985). Marriage itself is sufficient consideration for a prenuptial agreement. *See Spurlock v. Brown*, 91 Tenn. 241, 18 S.W. 868, 871 (1892); *Sanders v. Sanders*, 40 Tenn. App. 20, 288 S.W.2d 473, 477 (1955). Reconciliation in the face of an impending separation or divorce may be adequate consideration. *See, e.g., Gilley v. Gilley*, 778 S.W.2d 862, 864 (Tenn. Ct. App. 1989). However, the marriage itself cannot act as sufficient consideration for a postnuptial agreement because past consideration cannot

support a current promise. *See S.M. Williamson & Co. v. Ragsdale*, 170 Tenn. 439, 95 S.W.2d 922, 924 (1936). There must be consideration flowing to both parties as part of a postnuptial agreement. *Bratton* at 600.

Because of the confidential relationship which exists between husband and wife, postnuptial agreements are subjected to close scrutiny by the courts to ensure that they are fair and equitable. *See, e.g., Peirce v. Peirce*, 994 P.2d 193 (Utah 2000); *In re Estate of Gab*, 364 N.W.2d 924 (S.D. 1985); *In re Estate of Harber*, 104 Ariz. 79, 449 P.2d 7 (1969); *see also* 41 C.J.S. *Husband & Wife* 87 (1991) ("Since a husband and wife do not deal at arm's length, a fiduciary duty of the highest degree is imposed in transactions between them."). The *Bratton* Court stated:

> While it is lawful and not against public policy for husband and wife to enter into such contracts, yet they are not dealing with each other as strangers at arm's length. The relationship of husband and wife is one of special confidence and trust, requiring the utmost good faith and frankness in their dealings with each other. . . . Transactions of this character are scrutinized by the courts with great care, to the end that no unjust advantage may be obtained by one over the other by means of any oppression, deception, or fraud. Courts of equity will relieve against any unjust advantage procured by any such means, and less evidence is required in such cases to establish the fraud, oppression, or deception than if the parties had been dealing at arm's length as strangers. . . .

*Bratton* at 601 (quoting *In re Estate of Gab,* 364 N.W.2d 924 (S.D. 1985).

As with any other contract, a postnuptial agreement must be made for a lawful purpose and must not be contrary to the public policy of the state. *Sanders v. Sanders*, 288 S.W.2d 473 (Tenn. Ct. App. 1955), *Home Beneficial Association v. White*, 177 S.W.2d 545, 546 (Tenn. 1944). With regard to public policy our Supreme Court has stated that, "[t]he public policy of the State is to be found in its Constitution, its laws, its judicial decisions and the applicable rules of common law. *Nashville Ry. & Light Co. v. Lawson,* 229 S.W. 741 (Tenn. 1921), *Home Beneficial Association v. White*, 177 S.W.2d 545, 546 (Tenn. 1944).

> The meaning of the phrase 'public policy' is vague and variable; courts have not defined it, and there is no fixed rule to determine what contracts are repugnant to it. The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests. It is only because of the dominant public interest that one who, like respondent, has had the benefit of performance by the other party will be permitted to avoid his own promise.

> In determining whether this contract is void as being in violation of public policy it is proper to consider the situation of the parties at the time the contract was made and the purposes of the contract. *Lippman v. Boals*, 79 Tenn. 489; *Sanders v. Sanders*, 40 Tenn. App. 20, 288 S.W.2d 473, 57 A.L.R.2d 932.

*Hoyt v. Hoyt*, 372 S.W.2d 300, 302-303 (Tenn. 1963).

We must now determine whether the agreement entered into by Mr. and Ms. Stutz meets the requirements for a valid and enforceable postnuptial agreement. It is clear from the evidence cited above that the postnuptial agreement in this case constitutes a contract whereby Ms. Stutz exchanges her promise to surrender her equitable share of the marital estate in return for Mr. Stutz's agreement to enter into an adoption to which he is opposed. In this regard, we have noted Ms. Stutz's testimony that Mr. Stutz stated to her "That kid is not coming to my house unless [the postnuptial agreement] is signed today." We have further noted Mr. Stutz's own testimony that the adoption of LaShawn was contingent upon the execution of the postnuptial agreement and that absent execution of the agreement he was not going to participate in the child's adoption

It is well settled in our state that the best interest of the child is the paramount consideration in an adoption proceeding. *Sonet v. Unknown Father of J.D.H. (Sonet)*, 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990). It is assumed that persons seeking to adopt a child are motivated by the desire to love and care for the child - motivations that are naturally consistent with the child's best interest. However, the best interest of the child is ignored and the adoption process is subverted when a prospective adoptive parent who is otherwise adamantly opposed to adoption, as was Mr. Stutz, enters into an agreement to effect an adoption for the sole reason that he will realize financial gain if he does so. Monetary enrichment should not be the motivating factor for a consent to an adoption.

Mr. Stutz's motivation for entering into the postnuptial agreement and the adoption was financial. He bargained his consent to the adoption for a larger share of the marital estate in the event of a divorce. An adoption should not be viewed as a business opportunity by an adoptive parent. Nor can we condone Ms. Stutz's actions in entering into the postnuptial agreement. Although in some sense her entrance into the agreement may appear to be less objectionable in that she was willing to sacrifice material goods for the opportunity to raise and nurture the child, she too placed the child's needs second to her own. She wanted a child and did not hesitate to resort to aggressive financial manipulation to get what she wanted without regard for the fact that she was bringing the child into a family in which the father was at the time strongly resistant to the child being a part of that family. We find the agreement arrived at by these parties to be both cynical and self-serving. We further find that it exposed an adopted child to the unreasonable risk of being placed in an environment that was not in that child's best interest. We do not contest the assertion that both parents have come to love the adopted child in this case; however, as noted above, in determining whether a contract violates public policy we consider the situation of the parties when the contract was made. *Sanders v. Sanders*, 288 S.W.2d 473, 478 (Tenn. Ct. App. 1955). Our Legislature has expressed the public policy of the State regarding payments involved in the surrender of a child for

adoption by making it a Class C felony to sell or surrender a child to another person for money or anything of value and to receive such child for such payment of money or thing of value. Tenn. Code Ann. § 36-1-109. While we agree with Mr. Stutz that this statute is not directly applicable to the facts of this case, we do believe that it evidences the public policy of this State that a consent for a surrender or a consent to adopt is not to be bartered or sold and that an adoptive parent should not profit financially from an adoption. We cannot approve of and enforce an agreement in which a spouse in effect sells his or her consent to an adoption in exchange for a greater share of a marital estate in the event of a divorce. Accordingly, we find that the postnuptial agreement at issue to be invalid and unenforceable as against public policy.

VI.

The next issue we address is whether the trial court erred in granting a divorce to the parties based upon Mr. Stutz's "Motion to Grant Divorce" in which he admitted that he had been guilty of conduct that would entitle Ms. Stutz to a divorce and requested the trial court to declare the parties divorced. The trial court, without hearing any evidence, granted a divorce to both parties pursuant to Tenn. Code Ann. § 36-4-129(b) upon the motion and over the objection of Ms. Stutz. Ms. Stutz argues that Tenn.Code Ann. § 36-4-129 requires either a stipulation to, or proof of, grounds before a divorce may be awarded and that there was neither in this case. Mr. Stutz argues that his motion to grant the divorce was an admission of fault on his part, and that admission, coupled with the testimony heard by the trial court on the issue of the validity of the postnuptial agreement, was a sufficient basis for the granting of the divorce. Mr. Stutz also asserts that Ms. Stutz's notice of appeal was not timely filed since it came more than 30 days after the order granting the divorce. We agree with Ms. Stutz that there should have been an evidentiary hearing before the divorce was granted. Because there was neither a stipulation to nor proof as to grounds for divorce, the trial court had no authority under Tenn. Code. Ann. § 36-4-129 to grant a divorce to the parties. We further hold that the issue of marital fault was not litigated during the hearing on the postnuptial agreement and that the notice of appeal was timely filed as to this issue.

Ms. Stutz initiated this action by filing a complaint for divorce in which she alleged that Mr. Stutz was guilty of inappropriate marital conduct and that the parties had irreconcilable differences. Mr. Stutz admitted that there were irreconcilable differences, but he denied that he had been guilty of inappropriate marital conduct. Tenn.Code Ann.§ 36-4-129 provides:

> (a) In all actions for divorce from the bonds of matrimony or legal separation the parties may stipulate as to grounds and/or defenses.
>
> (b) The court may, upon stipulation to or proof of any ground for divorce pursuant to §36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone.

A stipulation is an agreement between counsel with respect to business before the court. *State v. Ford*, 725 S.W.2d 689, 691 (Tenn. Ct. App.1986). It is entered into mutually and voluntarily by the parties. *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 701 (Tenn. Ct. App. 1999). It is clear that Mr. and Ms. Stutz did not enter into any agreement regarding grounds for divorce. Mr. Stutz's statement in his motion that he admitted that he had been guilty of conduct so as to entitle Ms. Stutz to a divorce is not a stipulation because it is not an agreement between counsel. It is not entered into mutually by the parties. We do not deem this statement to be proof of grounds as contemplated by the statute. We have carefully read the record in this case and do not find that the issue of grounds for divorce was litigated by the parties in the hearing regarding the validity of the postnuptial agreement. The divorce was granted without a stipulation and without any testimony. This court in *Hyneman v. Hyneman,* 152 S.W.3d 549 (Tenn.Ct. App. 2003) held that absent a mutual stipulation agreed upon by the parties, pursuant to Tenn. Code Ann. §§ 36-4-114 and 36-4-129, the trial court must conduct a hearing prior to entering a final decree of divorce. Therefore, an evidentiary hearing was required in this case before the granting of the divorce.

We further hold that Ms. Stutz's notice of appeal was timely filed. The order granting the divorce was entered on July 2, 2003, and specifically reserved for further hearing all other issues not previously addressed. Issues of child support and parenting were resolved in an order entered on May 13, 2004. Ms. Stutz's notice of appeal was filed on June 3, 2004. This notice of appeal was timely because it was filed within 30 days of the entry of the final order in this cause. The July 2, 2003 order granting the divorce adjudicated fewer than all the claims of the parties and was not appealable pursuant to Tenn. R. Civ. P. 54. There is no exception in Tenn. R. Civ. P. 54 for orders granting divorces. Accordingly the trial court's decision granting the divorce to the parties is reversed and this cause is remanded for an evidentiary hearing.

VII.

For the foregoing reasons, we reverse the decision of the trial court and remand for a trial on the division of the marital estate, alimony, divorce, any other remaining issues, and for further proceedings consistent with this opinion. The costs on appeal are taxed to Mr. Stutz and his surety for which execution may issue, if necessary.

_____

SHARON G. LEE, JUDGE

-22-